**PALESTINE INFORMATION OFFICE, et al., Appellants**

v.

**George P. SHULTZ, Secretary of State, et al.**

No. 87–5398.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 23, 1988.

Decided Aug. 5, 1988.

Steven R. Shapiro, with whom John A.
Powell, Helen Hershkoff, Arthur B. Spit-

zer, Elizabeth Symonds, and Hope G. Nakamura, Washington, D.C., were on the brief, for appellants.

Douglas Letter, Atty., Dept. of Justice, with whom, Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty.,* and Patrick M. Norton, Asst. Legal Advisor for Near Eastern and South Asian Affairs, Dept. of State, were on the brief for appellees. Robert E. Kopp, Atty., Dept. of Justice, Washington, D.C., also entered an appearance, for appellee.

Leonard B. Boudin, with whom Peter Weiss, New York City, was on the brief amici curiae, the American Arab Anti–Discrimination Committee, et al., urging reversal.

Gary S. Marx, Roseland, N.J., was on the brief for amici curiae, the American Jewish Congress, et al., urging affirmance.

Daniel J. Popeo and Paul D. Kamenar, Washington, D.C., were on the brief for amici curiae, Congressman Jack Kemp, et al. urging affirmance.

Meyer Eisenberg, Washington, D.C., was on the brief for amicus curiae, the Anti–Defamation League of B'nai B'rith, urging affirmance.

Before MIKVA, STARR and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Concurring opinion filed by Circuit Judge SILBERMAN.

MIKVA, Circuit Judge:

The State Department late last year ordered the closing of the Palestine Information Office ("PIO") in Washington, D.C. It had found that the PIO operated as a foreign mission of the Palestine Liberation Organization ("PLO") and that the national interest in curbing international terrorism required its closure. Appellants challenged the order on constitutional and statutory grounds in the U.S. District Court. That court upheld the State Department's action as within its discretion under the Foreign

Missions Act, 22 U.S.C. §§ 4301 *et seq.*, and the Constitution. *Palestine Information Office v. Shultz*, 674 F.Supp. 910 (D.D.C. 1987). We affirm.

The executive branch acted in this case in the precise realm in which the Constitution accords it greatest power. The authority of the executive branch, always great in the foreign policy field, is at its apex when it acts, as here, pursuant to an express congressional authorization. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Our review is confined to determining that the Secretary acted in conformity with the provisions of the Foreign Missions Act, and that appellants' constitutional rights were not infringed. The wisdom of the government's decision to close the PIO is not at issue, despite appellants' efforts to couch the case in those terms. Such policy questions are firmly lodged in the political branches of government. *See Regan v. Wald*, 468 U.S. 222, 242, 104 S.Ct. 3026, 3037, 82 L.Ed. 2d 171 (1984).

We are not cavalier about appellants' constitutional challenges and are mindful of the important free speech, free association, and due process rights implicated by the Secretary's order. This order did not, however, infringe upon any of those constitutionally protected rights. Appellants are as free today as they were before the order to express whatever ideas they wish and to associate with whichever individuals they wish. They are not free, however, to set up an office that functions as a foreign mission for the PLO when the State Department finds that the national interest requires otherwise. Despite appellants' various arguments, we can find no part of the Constitution that guarantees them the right to do so. The incidental impact on speech caused by the conduct limitations of the order at issue is outweighed by the strong governmental interests behind the order. *See United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

* At time brief was filed.

The Foreign Missions Act operates in that subtle realm in which foreign policy matters brush up against rights of free speech and free expression. It is possible to envision truly difficult cases under the Act in which the State Department might designate as a foreign mission a domestic organization that arguably did not belong in that category. This is not, however, such a case, and the PIO is not such an organization. The PIO was funded almost entirely by the PLO, worked for no organization other than the PLO, and its director, Hasan Abdel Rahman, met regularly with the PLO to discuss its representation. The State Department had strong reasons for identifying it as a foreign mission and, having done so, for concluding that the nation's foreign policy interests required it to order the PIO to close. We have no basis for upsetting that determination.

## I. BACKGROUND

The PIO operated in Washington, D.C. from 1978 until its closing last December. During that time, it registered annually with the Department of Justice as an agent of the PLO. The PIO described its purpose and function in its last filing under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611 *et seq.*, as:

Public appearances and meetings with [the] American public in the hopes of promoting better Palestinian–American understanding. We seek to bring the views of the Palestinian people on their problems in the Middle East to the attention of the American people ...

*Joint Appendix ("J.A.")* at 23.

The PIO was, until it shut its doors, staffed by its director, Rahman, and eight other full- or part-time staff. All of the PIO staff were either United States citizens or resident aliens. Rahman stated that he did not "seek or receive regular instructions from the PLO on how to perform [his] job or run the office." *J.A.* at 24. But he added that he did "discuss issues of current importance in the Mideast with the PLO on a periodic basis." *Id.*

The PIO's 1987 budget was approximately $350,000. Rahman's salary was paid by the League of Arab States, of which the PLO is a member. The rest of the PIO's expenses were paid by the Palestine National Fund, a group that has been described by the appellants as the finance department of the PLO. *Palestine Information Office*, 674 F.Supp. at 914. The PIO works for no one other than the PLO. *Id.*

On September 15, 1987, the State Department, invoking its powers under the Foreign Missions Act, sent a letter to the PIO informing it that the State Department had designated it a foreign mission pursuant to 22 U.S.C. § 4302(a)(4)(B) and that it would have to cease all operations within 30 days. The State Department letter included a copy of the official State Department Designation, identifying the PIO as a "foreign mission." *See* Public Notice, 52 Fed.Reg. 37,035 (Oct. 2, 1987).

The Designation stated that the determination was based on the following grounds: (1) that the PIO was an "entity" within the meaning of the Act; (2) that the PIO was "substantially owned and/or effectively operated by the PLO"; (3) that its FARA registration "indicate[d] that it engage[d] in political activity and political propaganda on behalf of the PLO"; (4) that the PIO conducted its work on behalf of the PLO, which has received privileges and immunities under American law by virtue of its status as an observer at the United Nations; (5) that the PLO engaged in "some aspect of the conduct of international affairs" as evidenced by its membership in the League of Arab States and its observer status at the United Nations; and (6) that it was involved in "other activities," namely political activity and political propaganda, on behalf of the PLO. *Id.*

The State Department then stated in its Determination and Designation of Benefits Concerning Palestine Information Office that it had "determine[d] that it is reasonably necessary to protect the interests of the United States to require that the Palestine Information Office cease operation as a mission representing the Palestine Liber-

ation Organization." *Id.* It stated that the decision to order the office to close was based on "U.S. concern over terrorism committed and supported by individuals and organizations affiliated with the PLO, and as an expression of our overall policy condemning terrorism." *Id.* The order directed the PIO to divest itself of its real property as provided for by § 4305(b)(3) of the Act. The notice sent to the PIO stated that the order was not intended to interfere with "the constitutionally protected rights of U.S. citizens and permanent residents who are now associated with the Palestine Information Office." *J.A.* at 77.

The PIO was initially given 30 days in which to close, but the State Department extended the time period to comply with the order until December 1, 1987. The PIO and Rahman filed suit in district court on November 13, 1987 challenging the closing of the office. They contended in their suit that (1) the Foreign Missions Act does not authorize designation of the PIO as a foreign mission; and (2) that the Act as applied violates their first amendment free speech and free association rights and, because of its alleged vagueness and the lack of a preclosing hearing, their fifth amendment due process rights. Appellants sought an injunction against the closing of the office.

The district court ruled for the government on its motion for summary judgment, rejecting both appellants' statutory and constitutional claims. It held that the State Department had not abused the broad discretion accorded it by Congress under the Foreign Missions Act when it declared the PIO to be a foreign mission and ordered it closed. *Palestine Information Office*, 674 F.Supp. at 916–18. The court also rejected appellants' first amendment claim, finding that there was no burden placed on protected expression as a result of the designation, and their due process claims. *Id.* at 918–919. The appellants appeal from that decision.

## II. DISCUSSION

### A. *The Statutory Claims*

In passing the Foreign Missions Act, Congress vested broad authority over for-

eign missions in the Secretary of State. The Act defines a "foreign mission" as:

> any mission to or agency or entity in the United States which is involved in the diplomatic, consular, or other activities of, or which is substantially owned or effectively controlled by—
>
> (A) a foreign government, or
>
> (B) an organization ... representing a territory or political entity which has been granted diplomatic or other official privileges and immunities under the laws of the United States or which engages in some aspect of the conduct of the international affairs of such territory or political entity....

22 U.S.C. § 4302(a)(4). The statute expressly authorizes the Secretary of State to decide what constitutes a foreign mission for the purposes of the Act. It states that "[d]eterminations with respect to the meaning and applicability of the terms used in subsection (a) of this section shall be committed to the discretion of the Secretary." *Id.* § 4302(b). Once these missions are identified, the Act vests broad authority over them in the Secretary of State. It states that:

> The treatment to be accorded to a foreign mission in the United States shall be determined by the Secretary after due consideration of the benefits, privileges, and immunities provided to missions of the United States in the country or territory represented by that foreign mission, as well as matters relating to the protection of the interests of the United States.

*Id.* § 4301(c). The Act authorizes the Secretary to "require any foreign mission to divest itself of, or forego the use of, any real property" when he determines that such divestiture is "necessary to protect the interests of the United States." *Id.* § 4305(b).

In the case at bar, the State Department exercised powers granted to it by the Foreign Missions Act. In its official designation, it made the findings required by the statute to designate the PIO as a foreign mission. It found that the PIO was an

"entity"; that it was "substantially owned and/or effectively controlled by the PLO"; that it "conduct[ed] its functions on behalf of an organization which has received privileges and immunities under U.S. law"; and that it was involved in "other activities" within the meaning of the statute. Having determined that the PIO was a foreign mission, the State Department then found that it was "reasonably necessary to protect the interests of the United States to require that the Palestine Information Office cease operation as a mission representing the Palestine Liberation Organization."

When exercising its supervisory function over foreign missions, the State Department acts at the apex of its power. Because it has been accorded express authority from Congress to act in this area, it wields the combined power of both the executive and legislative branches. As the Supreme Court has stated of executive actions pursuant to express congressional grants of power, "[i]n such a case the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" *Dames & Moore v. Regan*, 453 U.S. 654, 668, 101 S.Ct. 2972, 2981, 69 L.Ed.2d 918 (1981) (*quoting Youngstown*, 343 U.S. at 637, 72 S.Ct. at 871 (Jackson, J., concurring)). If the authority accorded the executive branch when acting pursuant to a congressional grant of power is great, it is greater still in the case at bar because the Secretary was acting in the field of foreign affairs. The Supreme Court has recently instructed that "[m]atters relating 'to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Regan v. Wald*, 468 U.S. 222, 242, 104 S.Ct. 3026, 3038, 82 L.Ed.2d 171 (1984) (*quoting Harrisiades v. Shaughnessy*, 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952)). Given the highly deferential nature of our inquiry, and given the reasons set forth by the State Department in its order, we do not find that the State Department abused its discretion under the statute by designat-

ing the PIO as a "foreign mission" and ordering it to close.

■ Appellants challenge the designation of the PIO on several statutory grounds. First, they contend that the State Department's designation is facially deficient because it fails to allege that the PLO is a "foreign government" or an "organization ... representing a territory or political entity." We do not find this technical omission to be fatal. The State Department designation states that "the PIO conducts its functions on behalf of an organization which has received privileges and immunities by virtue of its status as an observer to the United Nations." This language effectively describes a political entity without using the phrase; indeed, the very fact that the State Department designated the PIO under the statute constitutes a representation by the Secretary that the PIO meets this criterion. To find the designation improper for not using the precise words "foreign government" or "organization ... representing a territory or political entity" would be to read the Foreign Missions Act "overliterally." *General Service Employees Union v. NLRB*, 578 F.2d 361, 366 (D.C.Cir.1978). Such a reading is particularly to be avoided in the context of foreign policy actions, in which the political branches have broad discretion. *See, e.g., Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir.1977) ("[c]ourts must beware 'ignoring ... the scope which in foreign affairs must be allowed to the President.'") (quoting *Mitchell v. Laird*, 488 F.2d 611, 616 (D.C. Cir.1973)). The State Department's order must survive this challenge.

■ Appellants' second contention is that the PIO is not an "entity" for the purposes of the Foreign Missions Act. The meaning of the word "entity" in general usage is quite broad, and clearly encompasses the PIO. Appellants maintain, however, that the legislative history of the amendment that added the category of "entity" to the Act indicates that it was meant to apply only to commercial enterprises. This argument is at odds with the plain language of the statute. Congress could have added the term "commercial entity" if

it had wanted to so limit the Secretary's discretion, but it did not do so. For this court to add this condition on its own would be to abjure the basic principle of statutory construction that words are ordinarily to be given their "plain meaning." *See, e.g., United Scenic Artists v. NLRB*, 762 F.2d 1027, 1032 n. 15 (D.C.Cir.1985) (employing the "elementary principle of statutory construction that ordinarily the plain meaning of statutory language controls, *i.e.,* 'words should be given their common and approved usage.' ") (citing 2A Sutherland, *Statutory Construction* § 46.06, at 74 (4th ed. 1984)). Our general reluctance to read into the word "entity" the condition appellants propose is further compounded by two additional considerations. First, the Foreign Missions Act explicitly vests "[d]eterminations with respect to the meaning and applicability of the terms used in subsection (a) ... [in] the discretion of the Secretary." 22 U.S.C. § 4302(b). Appellants' appeal to legislative history provides little basis for interposing our views in light of the statutory language and the Act's explicit injunction that the Secretary should make determinations with respect to meaning under the Act. In addition, we are mindful of the extra degree of latitude accorded to the executive branch in questions of diplomacy. *See, e.g., Regan,* 468 U.S. at 242, 104 S.Ct. at 3037. Taken together, we find that these considerations compel us to reject appellants' request that we second-guess the Secretary's interpretation of the statute.

The final statutory argument put forth by appellants is that the statutes in this area taken as a whole indicate that the Foreign Missions Act was not intended to cover an entity like the PIO. Appellants contend that the fact that the PIO was already covered by FARA indicates Congress's intention that it not also be covered by the Foreign Missions Act. The same considerations of deference to the Secretary's interpretation of the statute that guided us above lead us to uphold his determination. But even absent such deference to his interpretation, this court would be compelled to reject appellants' argument on this point. The two acts have highly distinct purposes: FARA requires disclosure by lobbyists; the Foreign Missions Act regulates foreign missions operated on behalf of foreign entities. Appellants adduce no basis for their assertion that Congress intended the reach of the acts to be mutually exclusive. The same flaw marks their assertion that the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.,* which authorizes the President to declare economic embargoes and to impose other economic regulations and prohibitions on foreign powers, precludes the application of the Foreign Missions Act. Congress expressed a clear intention that the executive branch's authority under the Foreign Missions Act be broad. *See, e.g.,* H.R.Rep. No. 102 (Part 1), 97th Cong., 1st Sess. 30 (1981) (the section of the Act committing discretion to the Secretary "is intended to avoid conflicting interpretations by different government agencies and courts and potential litigation that might detract from the efficient implementation of this title or might adversely affect the management of foreign affairs."). We cannot accept appellants' argument that these other statutes so sharply circumscribe the State Department's discretion under the Foreign Missions Act.

■ In addition to analyzing these small points of statutory construction, we recognize the need to ascertain that the statute has been properly applied as a whole in the case at bar. *See, e.g., Don't Tear It Down v. Pennsylvania Ave. Dev. Corp.,* 642 F.2d 527, 533 (D.C.Cir.1980) ("[S]tatutory meaning is of course to be derived, not from the reading of a single sentence or section, but from consideration of an entire enactment against the backdrop of its policies and objectives."). We believe that the State Department's designation of the PIO is fully consistent with the Foreign Missions Act as a whole. The Secretary did not abuse his broad discretion under the Act. The record contains clear and ample support for the Secretary's determination. Far from an authentically domestic organization, the PIO was funded almost entirely by an arm of the PLO; its director, Mr. Rahman, met regularly with the PLO to discuss his activ-

ities; and it represented no one but the PLO. The mere fact that an office is staffed in part by American citizens and that it does not call itself a foreign mission does not remove it from the State Department's reach under the Act.

The government asserts as an alternative justification for its actions that the State Department was authorized to order the PIO closed by article II of the Constitution. It contends that that article's grant to the executive branch of general foreign affairs power and specific authority to receive ambassadors authorizes its action. Because we find statutory authority for the State Department's order, and because we uphold the actions against appellants' constitutional challenges, we decline to embark on an inquiry into the reach of the article II delegations. In avoiding passing upon this issue, we are mindful of the settled jurisprudential doctrine that where a court is presented with both constitutional and statutory arguments in support of a judgment, it ought to address the statutory argument first in order to avoid unnecessary speculation on constitutional issues. *See, e.g., Blum v. Bacon,* 457 U.S. 132, 137, 102 S.Ct. 2355, 2359, 72 L.Ed.2d 728 (1982).

## B. *The Constitutional Claims*

In addition to their statutory arguments, appellants contend that the closing of the PIO infringed upon their first and fifth amendment rights. They contend that they were deprived of their rights under the first amendment because the State Department order infringed upon their right to associate with the PLO and with each other; their right to free speech; and their right to receive information. Appellants also maintain that the order violates their fifth amendment due process rights because it is unconstitutionally vague and because they were not given notice and an opportunity for a hearing before the office was closed. We are not persuaded, however, that appellants' constitutional rights were violated by the order.

■ Appellants contend that the State Department order deprives them of their first amendment right to free speech. We do not agree with that assessment. On its face, the order infringes not at all on the speech rights of any party. As the district court noted, "[t]he order does not 'prohibit, edit, or restrain the distribution of advocacy materials in an ostensible effort to protect the public from conversion, confusion, or deceit.'" *Palestine Information Office,* 674 F.Supp. at 918 (quoting *Meese v. Keene,* 481 U.S. 465, 107 S.Ct. 1862, 1871, 95 L.Ed.2d 415 (1987)). It simply "require[s] that the Palestine Information Office cease operation as a mission representing the Palestine Liberation Organization." 52 Fed.Reg. at 37,035. The State Department made clear at the time that it was not attempting to infringe upon appellants' protected rights. The official letter to the PLO accompanying the designation and order stated explicitly that nothing in the Department's order was to interfere with "the constitutionally protected rights of U.S. citizens and permanent residents who are now associated with the Palestine Information Office." *J.A.* at 77.

The State Department's order places only an incidental restriction upon the appellants' speech. It does not prevent them from advocating the Palestinian cause, nor from expressing any thought or making any statement that they could have made before its issuance. The order prohibits appellants only from speaking *in the capacity of a foreign mission of the PLO.* Cf. *Communist Party of the United States v. Subversive Activities Control Board,* 367 U.S. 1, 90, 81 S.Ct. 1357, 1407, 6 L.Ed.2d 625 (1961) (upholding statute that does not "attach the registration requirement to the incident of speech, but to the incidents of foreign domination ...."). Representing a foreign entity as a "foreign mission" is "conduct" within the meaning of *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Like many other kinds of conduct, the PIO's representation combines "speech" and "nonspeech" elements. *O'Brien,* 391 U.S. at 376, 88 S.Ct. at 1678. When this is the case, the Supreme Court has held that "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First

Amendment freedoms." *Id.* It has stated that a regulation that incidentally limits first amendment freedoms will be upheld:

> if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. at 1679. Applied to the case at bar, the *O'Brien* test requires that the State Department order be upheld.

The closing of the PIO meets all four elements of the *O'Brien* test. First, the closing of a foreign mission is clearly within the constitutional power of the government. The Supreme Court has long recognized the broad authority accorded the national government in the foreign policy realm. *See, e.g., Regan,* 468 U.S. at 242, 104 S.Ct. at 3037. We can conceive of no argument that the executive branch, acting as here pursuant to an express congressional grant of authority, is without constitutional authority to close a foreign mission.

Second, the action taken by the State Department advances an important government interest. The government has a strong interest in being able to close foreign missions of entities that we do not recognize that are located on American soil. The record contains ample evidence that the PIO was functioning as a foreign mission of the PIO, a foreign entity that this country does not recognize. The order closing the PIO advanced the government interest in closing missions representing foreign entities we do not recognize. The order also meets the third condition of *O'Brien,* that the underlying governmental interest be unrelated to the suppression of speech. The nation's interest in controlling representations of this sort is unrelated to the suppression of free expression of any kind. It is, rather, an interest that is " 'inherent in sovereignty.' " *Kleindienst v. Mandel,* 408 U.S. 753, 765, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972) (citation omitted).

Finally, the restriction of free speech caused by the State Department's order is no greater than is essential to the furtherance of its interest in being able to close foreign missions of entities we do not recognize. Appellants have argued that the government could advance its interest in other less intrusive ways, but those less intrusive alternatives are neither stated nor obvious. Under the circumstances here, where the PLO has no official mission in the United States, closing the PIO sends a unique message that mere expressions of displeasure cannot equal. Nor do there appear to be any lesser diplomatic sanctions that can be imposed where the entity in question, the PLO, has no official presence in this country. The State Department's order was no more restrictive than essential to achieve its designated purpose; it must be upheld.

■ Appellants also contend that the State Department order infringes upon their right to freedom of association. They maintain that the order infringes upon this right in two distinct ways: (1) it deprives Rahman of his right as a U.S. citizen to associate with other U.S. citizens and resident aliens who share his views; and (2) it infringes upon his right to associate with the PLO. Appellants misconstrue the dimensions of the right to freedom of association.

Appellants' first claim—that the order deprives Rahman of his right to associate with other individuals—is not supported by the record. The district court correctly found that the order does not prevent Rahman from exercising his right to associate with other individuals. *Palestine Information Office,* 674 F.Supp. at 918. Nothing in the State Department's order prevents Rahman from associating with the exact same individuals he associated with before the order was issued. Nor does it prevent him from working with them to promote the very same political ends they promoted before the order. All that the order changes is the relationship that this freely formed group may have to the PLO: it

must "cease operation as a mission representing the PLO." The order does not infringe upon Rahman's right, or anyone's right, to "band[ ] together to achieve a common end...." *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981). For this reason, appellants' first free association claim must fail.

■ Appellants' second claim—that the order deprives him of his right to associate with the PLO—asks this court to adopt an interpretation of the right to free association that is far broader than any the Supreme Court has ever endorsed. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984). The right to free association, however, is not an absolute; nowhere is that clearer than when measuring the rights of an American citizen to serve as an official representative of a foreign nation or other entity. The Court has long been willing to uphold limitations on free association conducted for an illegitimate purpose. *See, e.g., Norwood v. Harrison*, 413 U.S. 455, 470, 93 S.Ct. 2804, 2813, 37 L.Ed.2d 723 (1973) ("Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections."); *see also* Raggi, *An Independent Right to Freedom of Association*, 12 HARV. C.R.–C.L. L.REV. 1, 15 (1977) ("The first [question] must be whether, under the Constitution, the government could bar or hamper a sole individual engaging in the same pursuit.").

In considering appellants' claim about the right to associate with the PLO, we must weigh their interests against those of the government. *See, e.g., Regan*, 468 U.S. at 242, 104 S.Ct. at 3037 (stating that the Court in *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), "found the

Fifth Amendment right to travel, standing alone, insufficient to overcome the foreign policy justifications supporting the restriction."). The associational interest of appellants is minimal to nonexistent. The order does not prevent them from associating with any individual or group of individuals. It does not even prevent them from "associating" with the PLO in the normal sense of that word. It does not, for example, bar them from speaking with members of the PLO. It simply prevents them from acting as the organization's foreign mission. No court has ever found in the right to freedom of association a right to *represent* a foreign entity on American soil. The cases cited by appellants for this proposition are inapposite because, arising in the domestic context, they do not speak to the crucial issue of representation of foreign entities. *See, e.g., Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (holding that an SDS chapter could not be denied campus privileges because of ties to an allegedly violent national organization). In those cases in which the Court has heard claims that touch upon a right to associate with foreign entities, it has approved broad governmental discretion. *See, e.g., Zemel*, 381 U.S. at 16, 85 S.Ct. at 1280 (rejecting appellant's contention that "a First Amendment right ... is involved" in government's denial of right to travel to Cuba); *see also Communist Party*, 367 U.S. at 95–96, 81 S.Ct. at 1409–10 ("Means for effective resistance against foreign incursion—whether in the form of organizations which function, in some technical sense, as 'agents' of a foreign power, or in the form of organizations which, by complete dedication and obedience to foreign directives, make themselves the instruments of a foreign power—may not be denied to the national legislature.") (citation omitted). We are unable to find a free association right of Rahman and his co-workers to represent the PLO as a foreign mission in the United States.

Even if the appellants did have some minimal free association right that was infringed upon by the order, this court would be compelled to consider the strong interest of the government in " 'defending the coun-

try against foreign encroachments and dangers ...'" *Kleindienst*, 408 U.S. at 765, 92 S.Ct. at 2583 (citation omitted). At the time it issued the order, the State Department set forth some of the interests animating its closure order:

> This action is being taken to demonstrate US concerns over terrorism committed and supported by organizations affiliated with the PLO. Among our particular concerns are the continued membership on the PLO executive committee of Abu al Abbas, who has been linked directly with the murder of an American citizen; the participation in the Palestine National Congress of groups having a history of involvement with terrorism—for example, the Popular Front for the Liberation of Palestine and the Democratic Front for the Liberation of Palestine, both of which rejoined the PLO at the April PNC.... [W]e believe [that the order] is a strong signal of how we feel about the question of international terrorism and groups that associate with it.

*J.A.* at 56, 59. As noted above, our deference to the State Department on questions of foreign policy is great. *See Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."). "Given the traditional deference to executive judgment '[i]n this vast external realm,'" *Regan*, 468 U.S. at 243, 104 S.Ct. at 3038 (quoting *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936)), we uphold the State Department order against appellants' freedom of association claim.

■ Finally, we find no merit in appellants' contention that their due process rights were violated by the State Department order. The district court held that the PIO's rights were not violated because "a 'foreign mission' *qua* 'foreign mission'" cannot have any due process rights. *Palestine Information Office*, 674 F.Supp. at 919. This analysis is, however, circular. The PIO cannot be held to have forfeited its due process rights because it is a foreign mission when that is the very determi-

nation it wishes to challenge. A group of American citizens ordered by the government to close their office and sell off their property without a hearing would have at least a colorable due process claim. The more basic reason that appellants' argument must fail is that, given the broad discretion accorded the executive branch in foreign policy matters, appellants misstate the degree of process due prior to action under the Foreign Missions Act. The Supreme Court recognized in *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), that in some cases a post-deprivation opportunity to challenge that deprivation may be all the process that is due.

The *Ingraham* Court indicated that a court must weigh three factors in determining whether common-law remedies alone provide due process: (1) the private interest that will be affected; (2) the risk of erroneous deprivation of such interest; and (3) the state interest and the added burdens that additional procedural rights would entail. *See id.* at 675, 97 S.Ct. at 1414. In the *Ingraham* case, the Court considered these factors in measuring a "significant intrusion into an area of primary educational responsibility," *Ingraham*, 430 U.S. at 682, 97 S.Ct. at 1418, and found that common law remedies were sufficient for any possible deprivations suffered. The weighing of considerations conducted by the *Ingraham* Court must come out the same way in the case at bar. The harm done to appellants by an erroneous temporary closing of their office is not insubstantial. But neither was the threat posed by "corporal punishment in schools, no matter how severe" that was at issue in *Ingraham*. *Id.* at 683, 97 S.Ct. at 1419 (White, J., dissenting). The risk of erroneous designation in the case at bar appears to be no greater than the risk of erroneous punishment in *Ingraham*. Yet the burden on the government of requiring a hearing before the closing of a foreign mission strikes us as exceeding the burden on the state in *Ingraham*. The Supreme Court has long recognized and deferred to the need of the executive branch to act speedily and au-

thoritatively in the realm of foreign affairs. *See, e.g., Zemel,* 381 U.S. at 17, 85 S.Ct. at 1281 (noting "the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature ...."). Given these competing considerations, we hold that the "requirement of procedural due process is satisfied by ... preservation of common-law constraints and remedies." *Ingraham,* 430 U.S. at 683, 97 S.Ct. at 1419.

■ The assertion of individual due process rights to employment termination hearings by Rahman and the other PIO employees is no more convincing. The same *Ingraham* considerations apply to this claim, but there are even more basic reasons for denying it. Appellants contend, among other arguments, that Rahman and the other PIO employees had a due process right to a hearing before the PIO was closed because they had an employment interest in its continued operation. The causation underlying this argument, however, is far too attenuated. The due process clause has been held to protect government employees who were themselves dismissed from employment provided that they can show "rules or mutually explicit understandings that support [their] claim of entitlement to the benefit ...." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). This principle has never been extended so far as to include employees of private organizations who lost their positions due to actions taken by the government against their employer. The logic of appellants' argument would require the government to hold hearings before it took any action that might lead an employee to lose his job. We find no authority for this extraordinarily broad reading of the due process clause.

■ Appellants put forth a final due process claim. They contend that the Foreign Missions Act violates due process because of its vagueness. We are mindful of the dangers of overly vague laws, particularly when they threaten the exercise of constitutionally protected rights. *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."). Nevertheless, two considerations compel us to reject the challenge made by appellants. First, we do not believe that the Act is sufficiently vague to raise due process concerns. It is true that the Foreign Missions Act does not state precisely what actions will open up an entity for designation as a foreign mission. But it does place fairly specific conditions on the designation of a foreign mission: it must be an

entity in the United States which is involved in the diplomatic, consular, or other activities of, or which is substantially owned or effectively controlled by—(A) a foreign government, or (B) an organization ... representing a territory or political entity which has been granted diplomatic or other official privileges and immunities under the laws of the United States or which engages in some aspect of the conduct of the international affairs of such territory or political entity ...

22 U.S.C. § 4302(a)(4). We do not believe that the statute employs words of the level of imprecision that has marked other enactments struck down by the Supreme Court for vagueness. *See, e.g., Lanzetta v. New Jersey,* 306 U.S. 451, 458, 59 S.Ct. 618, 621, 83 L.Ed. 888 (1939) (statute making it illegal to be a "gangster" employs terms "so vague, indefinite and uncertain" that it violates due process); *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974) (criminal statute barring "treat[ing] contemptuously the flag of the United States" held void for vagueness). Appellants are correct that some of the terms in the Act appear somewhat indefinite, but we are mindful of the Supreme Court's observation in this context that "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rock-*

*ford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). Although some of the relationships governed by the Act are subtle, we nevertheless believe that the Act "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298–99.

A second consideration militates against accepting appellants' vagueness claim. The Supreme Court has long recognized that the special exigencies of foreign policy require Congress to draft statutes that "provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 324, 57 S.Ct. 216, 223, 81 L.Ed. 255 (1936). The Court has instructed that, because of the leeway necessary to represent adequately this nation's interests in foreign affairs, Congress "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel,* 381 U.S. at 17, 85 S.Ct. at 1281. While these decisions are certainly not an invitation to Congress to pass vague foreign policy statutes, they do indicate a recognition by the Court that the conduct of foreign policy will sometimes require more general enactments than other governmental functions. We note further that the statute at issue in this case is civil, and that the standard of certainty required is therefore less than in the criminal context. *Kolender v. Lawson,* 461 U.S. 352, 358–59 n. 8, 103 S.Ct. 1855, 359 n. 8, 75 L.Ed.2d 903 (1983). For these reasons, the Act must survive appellants' vagueness challenge.

## III. GRANT OF SUMMARY JUDGMENT

Finally, appellants challenge the district court's decision to grant the government's motion for summary judgment. They contend that the court abused its discretion because it did not have sufficient basis for rejecting an argument they made about the State Department's motivation in issuing the order. Appellants contend in their complaint that the State Department order was animated by discrimination on the basis of the content of the PIO's political message. Because of that assertion, appellants maintain that the district court abused its discretion when it held that the order was based on an expression of concern about terrorism. We cannot agree with appellants' contention about the propriety of summary judgment.

■■■■ Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. Rule 56. The court's role "is to determine whether any pertinent factual controversy exists, and in reviewing the record before it, the district court must give the party against whom the motion is made the most favorable view of the record if there is doubt as to the sufficiency of a factual showing." *Exxon Corp. v. Federal Trade Commission,* 663 F.2d 120, 126 (D.C.Cir.1980). In making its inquiry, however, "the court has the power to penetrate the allegations of fact in the pleadings and look at any evidential source to determine whether there is an issue of fact to be tried." *Mintz v. Mathers Fund, Inc.,* 463 F.2d 495, 498 (7th Cir.1972). Although the burden on the nonmoving party is not great, it is still "required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." 10A Wright & Miller, *Federal Practice and Procedure* § 2727 (2d ed. 1983).

■■■■ Appellants failed to put forth "any significant probative evidence tending to support" their claim that the State Department's order was motivated by content-based discrimination. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed. 2d 569 (1968). The mere assertion of a theory is not enough to constitute a genuine issue of material fact. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 627 (Fed.Cir.1984). Because appellants presented no factual support for their assertion that the State Department was not motivated by the concern about terrorism that it expressed in its order, the district

court was within its discretion when it granted the government's motion for summary judgment.

### IV. CONCLUSION

This is a case about the President—acting pursuant to express authorization from Congress—ordering a foreign mission to close its doors because its activities were deemed inimical to America's interests. Appellants have understandably sought to portray their claim as having deep constitutional significance implicating our most cherished first amendment rights. The facts of this case, however, do not support such a characterization. It is a free speech case in which no speech is limited and a free association case in which everyone involved is free to continue associating just as freely as before the challenged action. The State Department's actions in this case were in full accord with the Foreign Missions Act and the Constitution.

The decision of the district court is

*Affirmed.*

SILBERMAN, Circuit Judge, concurring:

I write separately because I think this case more deeply implicates First Amendment rights than my colleagues acknowledge. Indeed, as recently as May of 1987, the State Department itself thought the PIO's activities constitutionally protected:

> The continued existence of the PLO Information Office [sic] in Washington neither reflects nor requires the approval of the United States Government. The PLO Information Office is registered under the Foreign Agents Registration Act of 1938, as amended, with the Department of Justice and is subject to the provisions of that legislation. The Department of Justice has informed us that so long as that office regularly files reports with the Department of Justice on its activities as an agent of a foreign organization, complies with all other relevant U.S. laws, and is staffed by Americans or legal resident aliens, it is entitled to operate under the protection provided by the First Amendment of the Constitution.

Letter from James A. McVerry, Office of Jordan, Lebanon, and Syrian Affairs, to Robert Clark, Director of Government Affairs of the National Association of Arab–Americans (May 13, 1987).

I cannot agree with the majority that "the State Department's order places only an incidental restriction upon appellants' speech." Maj. op. at 939; *see also id.* at 944–945. The State Department's order requires them to discontinue use and dispose of the following goods and services:

*Services*

> (1) Public utilities and services, including telephone and telegraph, mail, public transportation and sanitation services; and
>
> (2) Personal services of individuals engaged within the United States for whatever purpose, whether on a temporary or regular basis. Such personal services include:
>
> > (a) Services relating to public relations, information, publishing, printing, advertising, distribution of literature, or mailing;
> >
> > (b) Plumbing, electrical, construction, maintenance, engineering, architectural or related services;
> >
> > (c) Packing, shipping, cartage and related services, including provision of packing materials; and
> >
> > (d) Financial services.

*Goods*

> (1) Motor vehicles;
>
> (2) Construction equipment and materials;
>
> (3) Equipment and materials for the maintenance of the mission, including typewriters, telephones, xerox machines and related materials;
>
> (4) Computers and automated data processing equipment; and
>
> (5) Furnishings for offices.

52 Fed.Reg. 37,035 (1987).

Surely it cannot be suggested that depriving appellants of all those means of communication only negligibly interferes with their speech. Restrictions on the par-

aphernalia by which speech is disseminated fundamentally implicate the First Amendment. *See Buckley v. Valeo,* 424 U.S. 1, 19, 96 S.Ct. 612, 634, 46 L.Ed.2d 659 (1976); *see also City of Lakewood v. Plain Dealer Publishing Co.,* — U.S. ——, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (4–3); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). The majority appears to mean that appellants may freely utilize all those means of communication so long as they do not act as a "foreign mission." Of course, no foreign government or entity has a First Amendment right to be represented diplomatically in the United States, *see Communist Party of the United States v. Subversive Activities Control Board,* 367 U.S. 1, 95–96, 81 S.Ct. 1357, 1409–10, 6 L.Ed.2d 625 (1961); *cf. Principality of Monaco v. Mississippi,* 292 U.S. 313, 330, 54 S.Ct. 745, 751, 78 L.Ed. 1282 (1934) ("[A] foreign State lies outside the structure of the Union."), but appellants deny they are a "foreign mission." The State Department clearly could not interfere with appellants' ability to communicate unless it justifiably concluded that appellants' activities were those of a foreign mission. The majority's constitutional analysis, it seems to me, assumes the conclusion: "We are unable to find a free association [or presumably free speech] right of Rahman and his co-workers to represent the PLO as a foreign mission in the United States." Maj. op. at 941. That is hardly the question; it is rather, has the State Department, by construing the statute—which admittedly gives the Department great discretion in defining its terms—acted consistently with the Constitution?

Nor do I think *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), is directly relevant to our analysis. The majority asserts, but does not explain how, the PIO's activities mix conduct and speech and that the Government's interest is in the regulation of the conduct rather than the speech. As I see the case, it is exactly the speech that the Government seeks to regulate, indeed repress, so long as that speech is sponsored by a foreign entity, the PLO, and can be thought to be uttered by the PLO's agent. The State Department has explicitly disavowed reliance on any criminal or terroristic acts by those staffing the PIO, and does not allege the PIO has engaged in any behavior other than its stated purpose of disseminating information. Unlike the *Communist Party* case, there is here no finding that the "operation to advance the objectives" of a foreign organization "includes extensive, long-standing organizational, as well as 'speech,' activity." 367 U.S. at 90, 81 S.Ct. at 1407; *see also Buckley,* 424 U.S. at 16, 96 S.Ct. at 633 ("*O'Brien* was not a case 'where the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful.'" (quoting *O'Brien,* 391 U.S. at 382, 88 S.Ct. at 1682)). Indeed, the Department's order and the district court relied in part on the context of appellants' speech to conclude they constituted a foreign mission. *See Palestine Information Office v. Shultz,* 674 F.Supp. 910, 917 (D.D.C.1987). The Government has abandoned that position on appeal, but it nonetheless seems untenable to me to claim the Government's efforts here are directed at conduct separate and apart from speech. The Government essentially claims statutory authority to regulate not the speaker's conduct but his status.

In short, since this is not a mixed speech/conduct case, *O'Brien* does not govern. In some respects the case is easier because the Government has the constitutional authority—depending on whether the PIO is a foreign mission—to ban the speech directly. But, in other respects, the case is more difficult since it cannot, in my judgment, be analyzed as a Government effort to regulate conduct apart from speech. Because the Government's constitutional authority to take the action it has taken, to apply the statute as it has, depends on appellants' status, we must be exceedingly careful to ensure that the Government's determination of the PIO's status is defensible. Americans, drawn from so many nations, often speak in a

fashion others, and perhaps the Government, perceive as advancing the interests of or "representing" a foreign entity. The State Department cannot, drawing upon the Foreign Missions Act, squelch or interfere with that speech simply by designating the speaker a "foreign mission." The Constitution, then, requires that a court carefully analyze the basis of the Department's determination notwithstanding the unusual discretion Congress delegated to the Department to define the statute's terms. *See* 22 U.S.C. §§ 4302(b), 4308(g). That is particularly true here where the Department's order simply repeats the statutory language without analysis or reasoning, and the Department refuses to advise appellants as to how they can arrange their affairs to avoid being characterized as a "foreign mission." The Department, to be sure, has no duty to provide appellants legal advice, but its guarded approach, insofar as it chills appellants' participation in protected activity, obviously risks extending the Department's *de facto* authority beyond constitutional limits. The Department's designation order states only:

Designation of the Palestine Information Office as a foreign mission is based on the following:

—It is an entity.

—It is substantially owned and/or effectively controlled by the PLO.

—The PIO conducts its functions on behalf of an organization which has received privileges and immunities under U.S. law. The PLO is accorded certain privileges and immunities by virtue of its status as an observer to the United Nations. Further, the PLO clearly engages in "some aspect of the conduct of international affairs," as evidenced by, for example, its membership in the League of Arab States and its status at the United Nations.

—It is involved in "other activities." The PIO registration statement under the Foreign Agents Registration Act indicates that the PIO engages in political activity and political propaganda on behalf of the PLO.

52 Fed.Reg. 37,035 (1987). As I have noted, the State Department has abandoned its reliance on the PIO's "other activities" (the statutory alternative to the "substantially owned or effectively controlled" test). To support its position under the statute, then, the Government must establish the PIO is an entity substantially owned or effectively controlled by an organization granted official privileges and immunities under United States law or which engages in the conduct of international affairs. I quite agree with the majority's treatment of appellants' argument that the PIO is not an entity within the meaning of the Act (as well as its disposal of the contention that the State Department erred by failing to allege the PLO is an organization "representing a territory or political entity"). Maj. op. at 937–938. And because there is no dispute the PLO is accorded official privileges and immunities under United States law, the only issue left for discussion is the vigorously disputed conclusion that the PIO is substantially owned or effectively controlled by the PLO.

The Government relies on four factors to substantiate its determination.

(1) that PIO Director Rahman periodically consults the PLO directly on matters of importance in the Middle East;

(2) that the PIO's funding comes directly or indirectly from the PLO;

(3) that the PIO is a registered agent of the PLO; and

(4) that the PIO represents no one else in the United States (thus serving to distinguish the PIO from scores of lobbyists for foreign governments in Washington).

In order to avoid a holding arguably allowing the State Department to deem a foreign mission whatever entity is politically unpopular, our review of the Department's determination of ownership or control must be searching and precise. Although the Department's order is conclusory, without sufficient reasoning to give much guidance to appellants or others who wish to avoid the consequences of designation as a foreign mission, under the statute no civil or criminal penalty can be imposed upon appellants in the event they order

their affairs differently and attempt to resume operations.[1] Under these circumstances (and only because of these circumstances) I think the Department's terse determination suffices and is adequately supported by some of the information upon which it based its decision. It is not apparent that the PLO "owns" the PIO (registered agent status and regular consultations do not seem to bear on ownership), but the undisputed facts upon which the State Department relied do satisfy the control test. Especially in the foreign affairs arena, where relationships may take a great variety of forms beyond those we know from corporations law, determination of control "is largely a matter of the working out of legislative policy in multiform situations of potentially great variety." *Communist Party*, 367 U.S. at 40, 81 S.Ct. at 1381. The PIO *acknowledges* that it represents the PLO (as a registered agent). Granted, not all registered agents are controlled by their principals, but substantial funding from the PLO, the absence of work for any other principal, and repeated consultation with PLO officials regarding their views on Middle East concerns support the inference that the PLO calls the shots and the actions of the PIO are not simply the result of appellants' independent but sympathetic convictions. And reliance on these factors requires neither analysis of the message the PIO seeks to broadcast in the United States nor examination of communications between principal and agent.

If an entity is primarily funded by a foreign organization,[2] represents that organization (as opposed to operating as an independent grantee of the funds), and represents no one else, I think the Department would be quite justified *in any case* in concluding that entity is effectively controlled by that organization and can thus be characterized as a foreign mission.

I therefore concur in the majority's judgment.

1. As I understand it, the enforcement provision of the Act, making it unlawful to provide benefits to a foreign mission contrary to the statute, 22 U.S.C. § 4311, does not erect a barrier to speech by a newly formed or *reorganized* entity. A supplier of goods or services would presumably be subject to this prohibition only in dealing with an entity *already declared* a foreign mission, and the section's provision for consultation with the Department by a supplier helps to ensure that entities not (or not yet) designated foreign missions are not affected.

That is not to ignore the costs, delay, or inconvenience in shutting down the shop and then reorganizing to resume operations. Indeed, these costs underscore my conclusion that the Department's order more than incidentally affects speech.

2. As the majority notes at 935, Rahman's salary is paid by the League of Arab States, of which the PLO is a member, with the remainder of the PIO's funding coming from the Palestine National Fund. We owe considerable deference to the State Department's determination that funding for a venture actually came from a particular overseas source. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 589–90, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952).