The **PATHFINDER FUND,** et al., Plaintiffs,

v.

**AGENCY FOR INTERNATIONAL DEVELOPMENT,** et al., Defendants.

**Civ. A. No. 89–0133 (HHG).**

United States District Court, District of Columbia.

Sept. 14, 1990.

Eldon V.C. Greenberg, Dina R. Lassow, Galloway & Greenberg, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., David J. Anderson, Director, Neil H. Koslowe, Special Litigation Counsel, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Howard M. Fry, Gen. Counsel, Stephen R. Tisa, Atty., Agency for Intern. Development, Washington, D.C., of counsel), for defendants.

## MEMORANDUM AND ORDER

HAROLD H. GREENE, District Judge.

The Agency for International Development (AID) requires all foreign nongovernmental family planning organizations that receive federal family planning funds to certify that they will not perform or actively promote abortion as a method of family planning. Plaintiffs, three domestic family planning organizations, contend that the requirement abridges their First Amendment rights of speech and association by effectively preventing them from joining overseas family planning groups in abortion related projects. For the reasons stated below, defendants' motion for summary judgment is granted and plaintiffs' motion is denied.

I

The Foreign Assistance Act of 1961, 22 U.S.C. § 2151 *et seq.*, authorizes foreign aid for, *inter alia*, voluntary population planning "in order to increase the opportunities and motivation for family planning and to reduce the rate of population growth." 22 U.S.C. § 2151b(b). While granting the President authority to furnish assistance "on such terms and conditions as he may determine," 22 U.S.C. § 2151b(b), Congress prohibited the use of funds to pay for abortions, or for any biomedical research on abortion or involuntary sterilization as a means of family planning.[1] 22 U.S.C. § 2151b(f).

In 1984, President Reagan announced certain abortion-related limitations on the use of family planning foreign aid funds that went further than the fund limitation set forth in 22 U.S.C. § 2151b(f). The Reagan Administration presented these new limitations at the United Nations-sponsored International Conference on Population in Mexico in August 1984. The restrictions, which became known as the "Mexico City Policy," provide, among other things, that the United States will withhold federal assistance from foreign NGOs that perform or actively promote abortion in any manner even if those activities are financed with private funds.

Pursuant to the Mexico City Policy, AID adopted new eligibility provisions for both foreign and domestic NGOs to be incorporated in the grants and cooperative agreements that AID requires its grantees to sign as a condition of receiving funds. The provisions require every foreign NGO

1. The President has delegated his authority to allocate family planning funds under 22 U.S.C. § 2151b(b) to the Director of the United States International Development and Cooperation Agency. Executive Order No. 12, 163, 44 Fed. Reg. 56,673 (1979). The Director has, in turn, delegated that authority to the Administrator of AID.

which receives federal family planning funds to certify in writing that "it will not, while receiving assistance under the grant, perform or actively promote abortion as a method of family planning in AID recipient countries or provide financial support to other foreign nongovernmental organizations that conduct such activities." AID Handbook 13, effective June 19, 1987, at 4C–49. These restrictions, contained in what is known as the Eligibility Clause of the funding agreements, extends to all activities of foreign NGO, not merely projects using AID funds.

On January 19, 1989, three domestic organizations which participate in international family planning projects, filed an action in this Court challenging the statutory authority for, and the constitutionality of AID's implementation of the Mexico City Policy.[2] On April, 1989, this Court denied plaintiffs' motion for a preliminary injunction, at the same time staying the case until a decision by the Court of Appeals for this Circuit in *DKT Memorial Fund, Ltd. v. AID*, another challenge to AID's implementation of the Mexico City Policy. The *DKT* decision was issued on October 10, 1989, 887 F.2d 275 (D.C.Cir.1989) [*DKT II*].

In *DKT II*, the Court of Appeals sustained the Eligibility Clause on the merits against all but one of the constitutional, statutory, and administrative claims made by the plaintiffs in that case. *See infra.*

Amici had argued in *DKT II* that AID's restriction on grants to any foreign NGO that *performs or promotes abortion as a method of family planning* might then infringe on DKT's right to associate with foreign NGOs in abortion-related projects. They maintained that the Clause crippled DKT *in its efforts to initiate, with its own funds, international cooperative projects to preserve or advance abortion rights* because the grant condition forbidding for-

eign grant recipients from receiving funds if they participate in abortion promotion buys off DKT's potential partners in international family planning projects. 887 F.2d at 294. This argument asserted that rather than to lose AID funding, DKT's potential foreign associates will withdraw from or decline to participate in abortion-related projects with DKT. *Id.* The Court of Appeals dismissed this claim—that the Clause burdened the plaintiffs' constitutional rights to associate with foreign NGOs on self-funded abortion-related projects—on ripeness grounds rather than on the merits.[3]

On January 23, 1990, plaintiffs in the instant case amended their complaint to press the issue left undecided by the Court of Appeals on the merits. On January 29, 1990, this Court lifted the stay in the case; both parties have filed cross-motions for summary judgment; and the matter is now ripe for decision.

## II

■ Plaintiffs argue that the Eligibility Clause infringes upon their First Amendment right to associate with foreign NGOs on abortion-related projects because it renders the exercise of that right more difficult. They maintain that the Clause, in effect, buys off their most effective foreign partners in family planning projects, thus violating their constitutionally protected right of freedom of association.

■ The constitutionally protected "freedom of association" embraces two distinct concepts, the right to "enter into and maintain certain intimate human relationships" called "freedom of intimate association," and the right to "associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly,

---

2. Plaintiffs are The Pathfinder Fund, the Population Council, and the Association for Voluntary Surgical Contraception Inc.

3. The Court of Appeals questioned whether organizations have a First Amendment right to associate with other organizations. *DKT Memorial Fund v. AID, supra,* 887 F.2d at 294–95. It noted that neither it nor the Supreme Court has

ever held that organizations have a protected right to associate with each other. *Id.* Neither party has raised that issue in the instant action. Accordingly, and in light of the conclusion *infra* that even if there is such a constitutional right it has not been infringed here, the Court will assume, without deciding, that there is such a First Amendment right of association.

petition for the redress of grievances, and the exercise of religion," called "freedom of expressive association." *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 (1984).

The Supreme Court has recognized that the First Amendment protects the right of expressive association against both "heavy-handed frontal attacks, but also from being stifled by more subtle governmental interference," *Lyng v. Int'l Union*, 485 U.S. 360, 367 n. 5, 108 S.Ct. 1184, 11 n. 5, 99 L.Ed.2d 380 (1988), *quoting Bates v. Little Rock*, 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960). Since so much state action has the potential incidentally and indirectly to burden the right of expressive association in some remote way,[4] indirect restraints have been held to violate the Constitution only if they "directly and substantially" interfere with the ability to associate by " 'order[ing]' " people not to associate or " 'prevent[ing]' " their ability to do so or " 'burden[ing]' " their ability to do so "in any significant manner." [5] *Id.* at 366, 367 n. 5, 108 S.Ct. at 1190, 1190 n. 5. In *Lyng*, for example, the Court held that the refusal to extend food stamp benefits to those on strike did not infringe the striker's right of expressive association even though it made it harder for them to engage in those protected activities. *Id.* at 368, 108 S.Ct. at 1190.

Likewise, *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1971), teaches that the extent of the burden determines whether an indirect restriction infringes the right on expressive association. *Id.* at 765, 92 S.Ct. at 2582. In *Kleindienst*, the Attorney General refused to allow a Belgian Marxist journalist named Mandel to enter the United States. Suit was brought by Mandel and university professors in the United States who claimed that the decision deprived the pro-fessors of their First Amendment right to hear and meet with Mandel. While upholding the exclusion without reaching the First Amendment claim, the Court concluded that were it to have reached the constitutional claim, the existence of alternative methods of receiving Mandel's ideas, *e.g.* books and articles, would be relevant to balancing the First Amendment rights against governmental interests. In other words, if the burden on the right of association was slight, the Constitution would not be infringed.

*Regan v. Taxation with Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), provides further support for this conclusion. In that case, a public interest group applied for a section 501(c)(3) federal tax status to exempt it from paying taxes and allow contributors to deduct contributions. The application was denied because the group engaged in substantial lobbying. The group argued, among other things, that the denial violated the First Amendment by conditioning the receipt of tax-deductible contributions upon its cessation of lobbying.

A unanimous Supreme Court rejected this argument noting that tax exemptions and deductibility are a form of subsidy. 461 U.S. at 544, 103 S.Ct. at 2000. It also observed that the plaintiff could obtain 501(c)(4) status (exemption only) for its lobbying activities and 501(c)(3) status (exemption and deduction) for its non-lobbying activities. Therefore, the Supreme Court concluded plaintiff was simply denied a subsidy for its lobbying activities and that Congress was not required by the First Amendment to subsidize lobbying. *Id.* at 546, 103 S.Ct. at 2001. The Court suggested that the situation would be different if the Internal Revenue Service imposed stringent requirements that would "effectively make it impossible" for a 501(c)(3)

---

**4.** In *Lyng*, for example, the strikers argued that the government's refusal to extend them food stamp benefits burdened their rights of expressive association by making it harder for them to strike. The Court rejected the argument stating that the burden was slight. *Id.* 485 U.S. at 366, 108 S.Ct. at 1190.

**5.** *Cf. NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958) (compelled disclosure of membership lists amounted to a "substantial restraint" on NAACP members' freedom of association because of likelihood of harassment, physical threats and economic retaliation).

organization to establish a 501(c)(3) lobbying affiliate. 461 U.S. at 544–45 n. 6, 103 S.Ct. at 2000–01 n. 6; *id.* at 553–54, 103 S.Ct. at 19 (Blackmun, J., concurring).[6]

■ Nowhere, in fact, is it clearer that the right of expressive association is not absolute than when the rights of Americans to associate with foreigners are at issue. *DKT II*, 887 F.2d at 295, *citing Palestine Information Office v. Schultz*, 853 F.2d 932 (D.C.Cir.1988). In *Palestine Information Office*, the State Department ordered the closing of the Washington office of the Palestine Liberation Organization. Plaintiffs, American citizens or resident aliens who staffed the Office, claimed, *inter alia*, that the closing infringed their right to associate with the PLO. The Court balanced plaintiffs' associational interests against the government interests concluding that the latter outweighed the former. 853 F.2d at 941.

Citing *Meyer v. Grant*, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1987), and *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), the plaintiffs assert that any increase in difficulty in associating with the foreign NGOs of their choice—no matter how small—infringes their constitutional right of association. *Meyer* and *Lamont*, however, stand for the unremarkable proposition that a statute that directly limits speech violates the First Amendment even

if it leaves open some means of speech. Moreover, both cases involved infringements on intimate *and* expressive association. The Eligibility Clause does not directly limit the plaintiffs' freedom of association, and the instant action presents only claims of expressive association.

■ In sum, a First Amendment violation is not found if governmental action has merely made it somewhat more difficult for domestic organizations to associate with the organizations of their choice. Mem. of April 19, 1989 at 11, *citing Lyng v. Int'l Union*, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988). If, however, it "directly and substantially" interferes with plaintiffs' ability to associate with foreign NGO's, then it is reviewed under a strict scrutiny standard. *Lyng*, 485 U.S. at 366, 108 S.Ct. at 1190.[7]

## III

Plaintiffs support their claim of substantial interference by citing a number of examples of foreign NGOs which allegedly declined to participate in abortion-related projects with plaintiffs. However, upon examination, it appears that the Eligibility Clause has had far less impact than plaintiffs suggest.

(a) *Columbia.* Plaintiffs' first example concerns Pathfinder's desire to collaborate

---

**6.** *The IRS requires only that the two groups be separately incorporated and keep records showing that the tax deductible contributions do not subsidize lobbying. Id. The Supreme Court said that this requirement was "not unduly burdensome." Id.*

**7.** Defendants cite *Kleindienst* for the proposition that implementation of a foreign policy must be sustained if it is facially legitimate and bona fide. *Kleindienst*, however, rests on Congress' "plenary power" to make rules for the admission of aliens. *Id.* 408 U.S. at 766, 92 S.Ct. at 2583. As the Court explained, "Over no conceivable subject is the legislative power of Congress more complete than it is over the admissions of aliens." *Id., quoting Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909). Nothing in the decision indicates that it applies to all areas of foreign policy. Indeed, both this Court and the Court of Appeals have rejected defendants' related claim that challenges to the Eligibility Clause raise

nonjusticiable political questions. Mem. of April 19, 1989 at 6 n. 2; *DKT Memorial Fund v. AID*, 810 F.2d 1236, 1238 (D.C.Cir.1987) [*DKT I*].

The Supreme Court has likewise held that merely because a challenged statute touches on foreign policy the government is not relieved of its duty to comply with the Constitution. *See generally, Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1984) (striking down statute prohibiting picketing at embassies and enacted pursuant to Congress' authority to "define and punish ... Offenses against the Law of Nations," Art. I, § 8 Cl. 10 of the Constitution); *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (even the President's power in foreign affairs is subject to the Constitution). *See also, Bullfrog Films Inc. v. Wick*, 847 F.2d 502, 511 (9th Cir. 1988) ("rejecting the suggestion that the First Amendment's protection is lessened when the expression is directed abroad").

with a Colombian NGO named PROFAMI-LIA. Prior to 1983, Pathfinder worked with PROFAMILIA on a project involving abortion counseling and the distribution of contraceptives. Pathfinder's executive director avers that as a result of the Eligibility Clause, PROFAMILIA stopped providing abortion counseling because it feared losing AID funding for its family planning work.[8]

But abortion is illegal in Colombia, except if there is a risk to the mother's life, see Article 343 and 344 of the Columbia Penal Code, and the president of PROFAMILIA asserts that it does not perform abortions or abortion counseling now nor has it in the past for just that reason:

It is therefore clear that for PROFAMILIA to avoid being incriminated as an accomplice in the crime of abortion that the institution not provide abortions means or information about abortion to pregnant women, either by promoters advisors or trainers, not perform "abortive procedures", nor supply abortive beverages.

Letter dated May 31, 1990 from PROFAMILIA President Fernando Tamayo to James E. Smith, AID Representative, United States Embassy, Bogata, Columbia. Tamayo further suggests that his organization is philosophically opposed to abortion:

[O]ur relation to abortion, (if it can be called a relationship) has only been that of preventing the same; since we have always oriented our activities and financial resources toward the promotion of various responsible family planning methods, and toward the provision of counseling services to Columbian couples in relation to responsible planned procreation. Id.

In short, if plaintiffs had approached PROFAMILIA to engage in a broader form of abortion counseling, they would have been rebuffed not because of the Eligibility Clause but because of Columbian law and PROFAMILIA's philosophy.

(b) Ecuador. Pathfinder next maintains that the AID policy prevents it from providing abortion counseling in Ecuador in liaison with APROFE, a local NGO. But Pathfinder concedes that it has not approached APROFE with this plan in recent years because "[t]o do so would be a futile act."

In fact, abortion is also illegal in Ecuador except in cases of risk to the mother's life, rape or incest, and APROFE asserts that

APROFE, since its beginnings in 1965, has never considered abortion a method of family planning. This determination has been and is part of a decision made by the Board of Directors and staff of APROFE with no external influence having had a bearing on this decision nor in any modification to the same.

In addition, APROFE would never violate the laws of Ecuador which expressly prohibit abortion, nor would it ever take actions to attempt to change these laws.[9]

(c) Brazil. The third example cited by plaintiffs is a research project Pathfinder would like to conduct with an NGO named Bem Estar Familia no Brasil (BEMFAM) in Brazil to assess the prevalence of abortion in Brazil, the attitudes of health care providers toward abortion, and the need for possible reform of Brazil's current abortion law, which prohibit the procedure except in cases of rape, incest or where the mother's life is at risk. BEMFAM expressed a disinclination to participate in the project because of concerns that to do so might violate the Eligibility Clause.

In the first place, it appears that many studies such as the one Pathfinder proposes are presently being conducted by Brazilian family planning organizations that do not receive AID funds, and there is no reason Pathfinder could not collaborate

**8.** Plaintiffs' claim rests wholly on an the Declaration of Daniel Pellegrom, Pathfinder's executive director; there are no accompanying affidavits from PROFAMILIA. Vague, unsupported and conclusory statements by Pellegrom about PROFAMILIA's reasons for not engaging in abortion-related projects with Pathfinder carry little weight, especially in the face of contradictory affidavits from PROFAMILIA.

**9.** Letter dated May 29, 1990 from D. Paolo Marangoni, Executive Director of APROFE to Manuel Rizzo, Population Chief, USAID, Quito, Ecuador.

with one or more of them. Gillespie Supp. Dec. ¶ 6(d). But Pathfinder has chosen not to do so, raising some questions about the seriousness of its intentions.

In any event, when potential collaborators exist and Pathfinder has chosen not approach them, it cannot reasonably maintain that its desire to participate in the abortion debate has been stymied or even significantly burdened by BEMFAM's refusal to collaborate on its proposed research project. Finally, the Eligibility Clause does not prohibit research on the prevalence of abortion (although it would prohibit lobbying to change Brazil's abortion laws).

(d) *Zaire.* The Population Council would like to give non–AID funds to Institut Medical Chretien du Kasai (IMCK), an NGO in Zaire, to conduct a community-based demographic study on the incidence of induced abortions, and it asserts that IMCK will not participate in the project for fear of jeopardizing its AID funding.

The fear lacks a basis in fact. IMCK is not barred by the Eligibility Clause from collaborating with the Council on a such a study, and AID has offered to confirm that fact to IMCK. Abortion itself is, however, illegal in Zaire except where there is risk to the mother's life.

(e) *Zimbabwe.* The Population Council would like to grant private funds to Zimbabwe National Family Planning Council (ZNFPC), an AID grantee in Zimbabwe, to conduct abortion-related research. ZNFPC, however, is a foreign governmental organization and is therefore not subject to the Eligibility Clause.

(f) *Kenya.* The Population Council asserts that it had to create a new organization in Kenya to perform research on septic and incomplete abortions because two existing Kenyan institutions would not participate in the project for fear of losing their AID funding. The Council next asserts that the Eligibility Clause effectively prevented it from working on the research with the Kenyatta National Hospital and the Kenyan Medical Association. And the Council further claims that the Medical Association had previously been denied fund-

ing by the National Council for Population Development (NCPD), a Kenyan AID grantee and a conduit for distributing AID funds, because NCPD had been advised by an unnamed AID official that it should not do any abortion-related work if it wanted to continue receiving AID funds.

In fact, the Kenyatta National Hospital and the NCPD are governmental organizations which are not subject to the Eligibility Clause. AID's mission in Kenya, moreover, has denied issuing such a warning to NCPD. Indeed, a number of abortion studies have been published in Kenya, and six other studies are currently in progress, funded by Pathfinder with non–AID funds. Two of the studies are being done by Nairobi and Kenyatta Universities, both governmental organizations to which the Eligibility Clause not apply.

(g) *Nigeria.* The Population Council also approached one Professor Ladipo of the University College Hospital, University of Ibadan, Nigeria, about the possibility of funding a study of septic and incomplete abortions in Nigeria. The study would focus on the use of contraceptives and the prevalence of induced abortions, and it has been used to improve family planning and medical services. The Council claims that Professor Ladipo declined to participate in the study because "AID had begun clamping down and that the timing was no longer fortuitous for the research."

In the first place, Professor Lapido does not even cite the Eligibility Clause as the basis of his decision. Although he refers vaguely to AID's clamping down, it is unclear to what this refers. It surely cannot be assumed that this refers to the Eligibility Clause. While the results of the research could not be used to lobby for changes in abortion laws, the Council apparently did not intend to use it for that purpose. And, the Council concedes that Professor Lapido believed that he would be able to perform the proposed project under the auspices of another organization.

The short of it is that plaintiffs have failed to provide a even single instance in which their desire to pursue abortion-relat-

ed work abroad has been significantly burdened by the Eligibility Clause.

First, six of the eight organizations that plaintiffs wish to associate with on abortion-related projects either do not believe in abortion (PROFAMILIA and APROFE) or are not subject to the Eligibility Clause because they are governmental organizations (IMCK, ZNFPC, NCPD and Kenyatta National Hospital). Numerous organizations that do not receive AID funding are currently engaged in the type of research plaintiffs wish to pursue in Brazil.

Second, plaintiffs are free to use non–AID funds to carry out abortion-related projects abroad by themselves; indeed, they have done just that in Kenya. Likewise, they are always free to associate with any number of foreign NGOs which do not receive AID monies as well as with governmental organizations to which the Eligibility Clause does not apply—options which plaintiffs have apparently failed to explore.

Third, the Eligibility Clause does not, in any way, prevent plaintiffs from associating with NGOs for abortion counseling and referrals and counseling in cases or rape, incest or when the mother's life is in jeopardy; abortion research; training and equipment to deal with incomplete and septic abortions, and post-abortion counseling.

It is true that the Eligibility Clause prevents plaintiffs from associating with their pick of foreign NGOs. As *Palestine Information Office* and *DKT II* teach, however, plaintiffs do not have an absolute right to associate with foreign nationals. The proper test is whether their right of association has been significantly burdened. Nothing proffered by plaintiffs indicates that, as a factual matter, the Clause prevents them or significantly hinders them from pursuing abortion-related projects abroad.

## IV

Since the Eligibility Clause does not impose a substantial burden on plaintiffs' right of expressive association, the Court is merely required to ascertain whether the Clause is rationally related to a legitimate government interest. *Lyng*, 485 U.S. at 370, 108 S.Ct. at 1191. This standard of review is of course quite deferential. The Mexico City Policy is an articulation of a United States policy of not only not funding abortions abroad, but also not contributing to any organization that performs or promotes abortion. Plaintiffs raise no issue as to the Executive's constitutional power to make this policy, and the Eligibility Clause merely implements that policy. Furthermore, while, as indicated above, the governmental action here involved may not be sustained on the simple basis that foreign policy is involved, it is a fact that to grant the relief plaintiffs request would require the Court to measure the relative importance of the Mexico City Policy and the Eligibility Clause in the foreign affairs of the United States—an activity that would be quite difficult for a court.[10]

For these reasons, the Court concludes that, since the Eligibility Clause is rationally related to a legitimate government interest, and since it does not substantially burden plaintiffs' ability to associate with foreign organizations, the validity of the Clause will be upheld.

Accordingly, it is this 14th day of September, 1990

ORDERED that plaintiffs' for summary judgment be and it is hereby denied; and it is further

ORDERED that defendants' motion for summary judgment be and it is hereby granted; and it further

ORDERED that the complaint be and it is hereby dismissed.

10. This might require the Court to assess, *inter alia*, which foreign government strongly supports the Mexico City policy and which does not, and which of those governments is more important to the United States.