# Presidential Discretion to Delay Making Determinations Under the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991

The President is required to make a determination that would trigger sanctions under the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 if he is presented with sufficient evidence to compel the determination.

The President may delay making a determination that would trigger sanctions under the Act when the delay is necessary to protect intelligence sources or methods used in counter-proliferation activities.

The President may delay making a determination that would trigger sanctions under the Act when no reasonable alternative means exist to protect the life of an intelligence source.

November 16, 1995

MEMORANDUM OPINION FOR THE
SPECIAL ASSISTANT TO THE PRESIDENT AND
LEGAL ADVISER TO THE NATIONAL SECURITY COUNCIL

You have asked for our opinion concerning the scope, if any, of the President's discretion to delay making the determinations that are prerequisite to imposing mandatory sanctions under the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991, Pub. L. No. 102–182, § 305(b), 105 Stat. 1245, 1250 (the "CBW Act"), codified in part as an amendment to the Export Administration Act. See 50 U.S.C. app. § 2410c.[1] We conclude that the CBW Act permits the President to delay making determinations that would trigger sanctions under this section, when the delay is necessary to protect intelligence sources or methods used for acquiring intelligence relating to CBW proliferation.

You have also asked whether the President has any greater ability to delay a determination when the life of an intelligence source would be placed at substantial risk by the imposition of sanctions and no alternative reasonable means exists to exfiltrate or otherwise protect the source. This extreme case creates a conflict with the President's constitutional obligations and various of his statutory duties. In such circumstances, we conclude that the President can delay making a determination to protect the life of the source.

## I.

Section 2410c of title 50 appendix reads in part as follows:

---

[1] Virtually identical provisions were also codified as amendments to the Arms Export Control Act ("AECA"). See 22 U.S.C. § 2798. For convenience, the citations herein are only to the Export Administration Act provisions. Our opinion, however, applies equally to both sets of provisions.

Except as provided in subsection (b)(2), the President shall impose both of the sanctions described in subsection (c) if the President determines that a foreign person, on or after the date of enactment of this section,[2] has knowingly and materially contributed—

(A) through the export from the United States of any goods or technology that are subject to the jurisdiction of the United States under this Act, . . . or

(B) through the export from any other country of any goods or technology that would be, if they were United States goods or technology, subject to the jurisdiction of the United States under this Act . . .

to the efforts by any foreign country, project, or entity described in paragraph (2) to use, develop, produce, stockpile, or otherwise acquire chemical or biological weapons.

50 U.S.C. app. § 2410c(a)(1).[3]

The "foreign countr[ies]" to which subsection (a)(1) refers include any foreign country that the President determines to have used chemical or biological weapons in violation of international law, used lethal chemical or biological weapons against its own nationals, or made substantial preparations to engage in either of those two activities; any foreign country whose government is determined to have repeatedly supported acts of international terrorism; or any other foreign country, project, or entity designated by the President. *Id.* § 2410c(a)(2).

Once a determination has been made, both procurement and import sanctions are liable to be imposed. *Id.* § 2410c(c)(2). Congress "urges" the President, before imposing sanctions, to engage in consultations "immediately" with the foreign government with primary jurisdiction over the person subject to the sanctions. *Id.* § 2410c(b)(1). In order to pursue such consultations, the President may delay imposing sanctions for up to 90 days. *Id.* § 2410c(b)(2). Following these consultations, the President "shall" impose sanctions unless he determines and certifies to Congress that the government has taken "specific and effective actions" to end the involvement of the subject person in the sanctionable activities. *Id.* A further delay of up to 90 days is authorized if the President determines and cer-

---

2 The effective date of the statute was October 28, 1991.

3 The comparable provision of the AECA is virtually identical, except for the addition of a third basis for the President's determination. Under AECA, the imposition of sanctions can also be based on a determination that a foreign person contributed to a foreign country's use or acquisition of chemical or biological weapons "through any other transaction not subject to sanctions pursuant to the Export Administration Act of 1979." 22 U.S.C. § 2798(a)(1)(C).

tifies to Congress that the foreign government is "in the process" of taking the appropriate actions. *Id.*

The President is authorized not to apply or maintain sanctions in certain specified circumstances. *Id.* § 2410c(c)(2). Thus, the President is not required to impose sanctions in certain cases of procurement of defense articles or defense services (e.g., those articles or services that the President determines are "essential to the national security under defense coproduction agreements"). *Id.* Any sanction that is imposed shall apply for at least 12 months, and shall cease only upon a determination by the President, and certification to Congress, that reliable information indicates that the foreign person under sanction has ceased to aid and abet the activities described in subsection (a)(1). *Id.* § 2410c(d). Twelve months after imposing sanctions, the President may also waive further application of the sanctions, if he determines and certifies to Congress that such a waiver is "important to the national security interests of the United States." *Id.* § 2410c(e)(1).

We believe that § 2410c permits the President to delay making a determination that would trigger sanctions. The statute permits a delay, however, only when a delay is necessary to advance the policy of the statute by protecting intelligence sources or methods used in counterproliferation activities.

We begin by considering whether § 2410c *requires* the President to make a determination leading to the imposition of sanctions when presented with appropriate facts, or merely grants him the *discretion* to make or to decline to make such a determination in those circumstances. We conclude that § 2410 does impose a mandate that requires the President to make a determination when presented with the appropriate facts. We then consider whether § 2410c permits the President to delay making a determination required by the statute. We first review the text and structure of § 2410c and related statutes. Finding that evidence inconclusive, we turn to the legislative history and administrative construction of the statute. Our review of that history establishes that the President has some discretion to delay making the statutory determinations, if such a delay is necessary to protect intelligence sources or methods used in detecting or preventing CBW proliferation.

II.

Our first question is whether § 2410c *requires* the President to make a determination that a foreign person has "knowingly and materially contributed" to prohibited CBW efforts if his subordinates present him with evidence that establishes that such a state of affairs exists, or whether the President has the discretion to make or decline to make that determination in those circumstances. We believe that the statute requires the President to make the determination.

It is often the case that "Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions, and it may leave the determination of

such time to the decision of an Executive." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 407 (1928). When it delegates the power, and prescribes the duty, to make such determinations, the President may be considered "the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect." *Id.* at 411. We believe that § 2410c casts the President in such a role, and requires him to make a determination if the facts available to him establish that the conditions described in the statute exist.[4]

The language and purpose of the CBW Act demonstrate that the President has a *duty* to make determinations, not merely the *discretion* to do so. Section 2410c(a)(1) states that the President "*shall* impose" the specified sanctions "if [he] determines" that the predicate facts exist (emphasis added). As discussed at length in Part IV below, the legislative history confirms that this language mandates that sanctions be imposed (once the appropriate determinations are made).[5] We have advised the National Security Council ("NSC") that similar language in a closely related export control statute gave the President very limited, if any, discretion to delay or withhold making the predicate determination. *See* Memorandum to Files from Paul P. Colborn, Acting Deputy Assistant Attorney General and Jacques deLisle, Attorney-Adviser, Office of Legal Counsel, *Re: Presidential Discretion to Make "Determinations" Concerning Foreign Countries* (July 22, 1993) (the "July 1993 Memo").

In the July 1993 Memo, we construed the missile technology control provisions of the Export Administration Act ("EAA"), 50 U.S.C. app. § 2410b(b), which state that the President "shall impose" sanctions "if the President determines" that a foreign person is engaged in the activities covered by the statute. We advised that "[r]eading the arguably indeterminate phrases 'if the President determines' and 'if the President has made a determination' as doing no more than authorizing a discretionary determination would nearly make a nullity of Congress's apparently mandatory 'shall impose' language later in the section." July 1993 Memo at 3–4. Similarly here, it would defeat Congress's fundamental intent of ensuring that sanctions are imposed on foreign persons who are determined to be CBW Act proliferators,[6] if the President could simply refuse to make

---

[4] *Cf. Field v. Clark*, 143 U.S. 649, 692–93 (1892); *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 793–94 (Fed. Cir. 1984) (construing statutes to mandate, not merely to authorize, presidential determinations of fact).

[5] In brief, the legislative record shows that, in 1990, President Bush pocket-vetoed a precursor of the present CBW Act, H.R. 4653, 101st Cong. (1990), on the ground that it left him with insufficient discretion to delay or withhold sanctions. State Department officials in testimony before Congress emphasized the President's concerns with a regime of mandatory sanctions. Congress, however, was plainly unpersuaded that the President should have discretion to withhold sanctions on foreign persons (i.e., companies) found to be CBW proliferators. At least three Senators responded to President Bush's pocket veto of H.R. 4653 by firmly rejecting the notion that "automatic" sanctions were potentially harmful. The final bill that passed Congress, H.R. 1415, 102d Cong. (1991), embodied the Senators', rather than the President's, policy preferences: it included provisions for mandatory sanctions. A successor bill enacted soon thereafter, H.R. 1724, 102d Cong. (1991), which is now codified in relevant part as the CBW Act, also mandated sanctions if the appropriate determinations were made.

[6] As further discussed below, § 2410c permits the President to engage in consultations with the foreign country having jurisdiction over the proliferator, before the sanctions must come into effect. This provision qualifies, but does not negate, the mandatory nature of the sanctions.

sanction-triggering determinations at all. Accordingly, we believe that the President has a duty to make the determinations specified in the statute if he is presented with sufficient evidence to compel that conclusion.[7]

## III.

We next consider whether, notwithstanding that it imposes a mandatory duty on the President to make the determination described in that section when presented with appropriate facts, § 2410c nonetheless affords the President with discretion to *delay* making the determination when the delay is necessary to protect intelligence sources or methods used in counterproliferation. In this Part, we analyze the text and structure of the statute and related provisions, and find that, without more, such analysis cannot decide the issue. In Parts IV and V, we review the legislative and administrative history. We conclude that § 2410c does provide such discretion, subject to the constraints explicated in Part VI.

## A.

Section 2410c delegates to the President the power (and imposes the duty) to make the determination that a foreign person has "knowingly and materially" contributed through exports to a proscribed country's CBW efforts and to sanction the foreign person for that conduct. Because the President possesses varied and substantial constitutional powers in his own right in the field of foreign affairs,[8] congressional delegations of power to the President to act in that area are understood to give him unusually wide-ranging powers.[9] Moreover, the special institutional capabilities of the executive branch — including its ability to respond

---

[7] In construing the missile technology control statute at issue in the July 1993 Memo, we noted that the presence of a broad waiver provision in that statute confirmed our view that the statute contained a mandate rather than a grant of discretion. The CBW Act we construe here lacks a correspondingly broad waiver provision. While such a provision would certainly support our analysis, we find that in light of the text of the CBW Act and the persuasive evidence of congressional intent, the lack of a waiver provision does not affect our conclusion that the President, with limited exceptions, is required to make the determination prescribed under the CBW Act when presented with appropriate facts.

[8] *See, e.g., Department of the Navy v. Egan*, 484 U.S. 518, 529 (1988) (Court has "recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive.'") (quoting *Haig v. Agee*, 453 U.S. 280, 293–94 (1981)); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 705 n.18 (1976) ("[T]he conduct of [foreign policy] is committed primarily to the Executive Branch. . . ."); *United States v. Louisiana*, 363 U.S. 1, 35 (1960) (President is "the constitutional representative of the United States in its dealings with foreign nations."); *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948). Relatedly, the President possesses significant constitutional powers to safeguard sensitive national security information. *See, e.g., Webster v. Doe*, 486 U.S. 592, 605–06 (1988) (O'Connor, J., concurring in part and dissenting in part); *Department of the Navy v. Egan*, 484 U.S. at 527; *Haig v. Agee*, 453 U.S. at 307–08; *New York Times Co. v. United States*, 403 U.S. 713, 728–29 (1971) (Stewart, J., joined by White, J., concurring); *Hill v. Department of Air Force*, 844 F.2d 1407, 1411 (10th Cir.), *cert. denied*, 488 U.S. 825 (1988). He also possesses some measure of inherent power with respect to foreign commerce, *see Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 329 (1994); *see also Diversion of Water From Niagara River*, 30 Op. Att'y Gen. 217, 221–22 (1913) (opining that in absence of legislation, the President may determine the conditions of the importation of electrical power from Canada).

[9] *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 & n.2 (1952) (Jackson, J., concurring).

flexibly to unforeseen contingencies and its access to sensitive information [10] — have provided practical reasons for Congress to confer broad delegations of power over the conduct of foreign affairs to the President. "[B]ecause of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature, Congress — in giving the Executive authority over matters of foreign affairs — must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk,* 381 U.S. 1, 17 (1965).[11] Thus, "[b]oth Congress and the courts have traditionally sought to avoid restricting the Executive unduly in matters affecting foreign relations because of the need for flexibility in this area and the fact that the Constitution entrusts the external affairs of the Nation primarily to the Executive." *Export Sales of Agricultural Commodities to Soviet Union and Eastern European Bloc Countries,* 42 Op. Att'y Gen. 229, 237–38 (1963). In light of these considerations, we would not presume that, in delegating power under § 2410c, Congress has sought to limit the President's otherwise broad discretion, absent clear evidence of such a congressional intent.[12]

The reasoning that supports the inference that Congress typically accords the President broad discretion when it authorizes him to act in the field of foreign affairs is equally applicable to the issue of timing. The "changeable and explosive nature of contemporary international relations," *Zemel v. Rusk,* 381 U.S. at 17, renders it difficult and sometimes impossible for Congress to gauge in advance the immediate consequences of actions that it permits or requires the President to take. In general, moreover, the authority "to consider the foreign affairs rami-

---

[10] *See Chicago & Southern Air Lines, Inc.,* 333 U.S. at 111 ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world."); *see also* Harold H. Koh, *Why the President (Almost) Always Wins in Foreign Affairs: Lessons of the Iran-Contra Affair,* 97 Yale L.J. 1255, 1292 (1988).

[11] *Accord Haig v. Agee,* 453 U.S. at 292, *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 320 (1936) ("[C]ongressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved."); *Palestine Info. Office v. Shultz,* 853 F.2d 932, 937 (D.C. Cir. 1988) (Mikva, J.), *Sardino v. Federal Reserve Bank,* 361 F.2d 106, 110 (2d Cir.) (Friendly, J.), *cert. denied,* 385 U.S. 898 (1966).

Relying on such reasons, the Ninth Circuit has upheld, against a nondelegation challenge, the authority of the executive branch to punish the unlicensed export of goods under the EAA, despite the preclusion of judicial review of administrative action.

> The fact that the EAA involves matters of foreign policy and national security also counsels in favor of upholding the Act's preclusion of judicial review. . . . Permitting Congress broadly to delegate decisions about controlled exports to an agency makes sense; it would be impossible for Congress to revise the [Commodity Control List] quickly enough to respond to the fast-paced developments in the foreign policy arena. . . . [T]he Supreme Court has consistently emphasized that broad delegations are appropriate in the foreign policy arena. . . .

*United States v. Bozarov,* 974 F.2d 1037, 1044 (9th Cir. 1992), *cert. denied,* 507 U.S. 917 (1993); *see also Duracell, Inc. v. U.S. Int'l Trade Comm'n,* 778 F.2d 1578, 1582 & n.13 (Fed. Cir. 1985).

[12] *See Presidential Authority to Adjust Ferroalloy Imports Under § 232(b) of the Trade Expansion Act of 1962,* 6 Op. O.L.C. 557, 562 (1982) (A statutory requirement that the President, after receiving a Report from the Secretary of Commerce that imports of materials into United States threatened national security, either adjust imports or reject the Secretary's findings, allowed the President to defer decision by "retain[ing] the Report for further consideration," because "[n]o time frame constrains the President.").

fications of a particular mode of [statutory] enforcement and to suspend implementation [of the statute] to avoid a confrontation," is, "[i]n the absence of a statutory mandate or express prohibition," to "be found in the inherent and well recognized powers of the executive branch." *Olegario v. United States*, 629 F.2d 204, 226 (2d Cir. 1980), *cert. denied*, 450 U.S. 980 (1981). A rule of construction that accords the President reasonable discretion over timing, in the absence of evidence of contrary legislative intent, is thus most consistent with the ordinary relationship between the President and Congress in foreign affairs.

Furthermore, as a general rule of administrative law, an agency may be under a statutory mandate to perform a certain act, and yet retain some discretion over the timing of the performance of that act: the rule is that it must proceed in a reasonably timely manner. Furthermore, an agency may be operating under a statutory provision that regulates the timing of its performance, and yet not be wholly devoid of statutory discretion to delay the performance beyond the statutory deadline.[13] A nondiscretionary duty of timeliness ordinarily exists only when the statute " 'categorically mandat[es]' that all specified action be taken by a date-certain deadline." *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987) (quoting *NRDC v. Train*, 510 F.2d 692, 712 (D.C. Cir. 1974)). "[I]t is highly improbable that a deadline will ever be nondiscretionary, i.e. clear-cut, if it exists only by reason of an inference drawn from the overall statutory framework." *Id.* at 791.

To be sure, if "the statutory language itself contain[ed] [a] direction to the [President] automatically and regardless of the circumstances" to make the determination upon a certain event, *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 233 (1986), then the President might well be unable to delay making the determination.[14] Assuming, however, that Congress chose not to dictate the timing of the determinations that trigger sanctions, then § 2410c could be construed to permit the President some discretion in the timing of a determination, at least in certain cases.

In light of these general considerations — that delegations of foreign policy powers to the President must be construed broadly, and that in the absence of a specific duty to make determinations within a fixed time-frame, the President has discretion to delay a determination for a reasonable period — we would not, absent countervailing reasons, read § 2410c to impose a duty on the President

---

[13] *See, e.g.. Cutler v. Hayes*, 818 F.2d 879, 896–98 (D.C. Cir. 1987); *Presidential Authority to Extend Deadline for Submission of an Emergency Board Report Under the Railway Labor Act*, 14 Op. O.L.C. 57, 59–60 (1990) (discussing interpretation of current statutory timeliness requirements).

[14] The statute at issue in *Japan Whaling Association* required the Secretary of Commerce to "periodically monitor the activities of foreign nationals that may affect [international fishery conservation programs]," *id.* at 226 (alteration in original) (quoting 22 U.S.C. § 1978(a)(3)(A)), "promptly investigate any activity by foreign nationals that . . . may be cause for certification [that a foreign country's actions had diminished the effectiveness of an international whaling convention]," *id.* (quoting 22 U.S.C. § 1978(a)(3)(B)), and "promptly conclude; and reach a decision with respect to; [that] investigation." *Id.* (alteration in original) (quoting 22 U.S.C. § 1978(a)(3)(C)). The Court had no difficulty in concluding that this language required the Secretary to make a certification decision promptly. *Id.* at 232.

to act other than in a reasonably timely manner. But the analysis cannot end there. The text of § 2410c and related statutes, coupled with the legislative history, clearly imply that there are some constraints on the President's discretion to delay making a determination. We begin by reviewing the textual and structural arguments for the view that § 2410c in fact gives the President little or no discretion to delay making determinations.

## B.

First, as we have already noted, § 2410c(a)(1) clearly imposes a duty: it states that the President "*shall* impose" the specified sanctions "if [he] determines" that the predicate facts exist (emphasis added). "Shall" here undoubtedly expresses a mandate.[15] The duty to impose sanctions after a determination has been made suggests that there are limits on the President's authority to postpone making the determination, once the facts relevant to the determination are before him.

Second, the remainder of § 2410c confirms that Congress did seek to limit, in fact rather sharply, the President's discretion over the timing of his determinations. The section expresses the sense of Congress that the President, after making a determination, "immediately" consult with the foreign country that has jurisdiction over the proliferator, and authorizes a 90-day delay in imposing sanctions to permit consultations with that country to go forward. A further 90-day delay is permitted upon an appropriate certification to Congress that the consultations are going forward. The fact that consultations are to occur "immediately" after the determination, and that there can be delays in imposing sanctions for up to 180 post-determination days to allow the consultations to proceed, suggests that Congress intended to accommodate, structure and delimit the President's ability to conduct diplomacy and to take account of foreign policy concerns before being bound to impose sanctions. Outside that statutory framework, however, it appears that discretion to withhold sanctions — and to postpone making the determinations that triggered them — was to be limited or non-existent. Given the breadth of Congress's power over foreign commerce, such limitations on the President's discretion are not on their face invalid.

Third, in 1991, Congress codified CBW sanctions not only in the provisions at issue in title 50 appendix, but also in title 22.[16] Thus, § 2410c is in pari materia with the title 22 provisions. The latter provisions deal both with foreign governments and foreign persons. As noted earlier, the provisions of § 2798 of title 22,

---

[15] *See Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 432 (1995); *id.* at 438–39 (Souter, J., dissenting). The legislative history (reviewed more fully in Part III below) underscores the nondiscretionary nature of the sanctions that the language of § 2410c conveys.

[16] Indeed, the relevant provisions in title 22, like those in title 50 appendix, were enacted as part of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, Pub. L. No. 102–138, § 505, 105 Stat. 647, 724 ("FRA"), and superseded by virtually identical provisions in the CBW, Pub. L. No. 102–182, § 305(b), 105 Stat. at 1250. These two 1991 enactments are discussed further in Part IV below.

dealing with foreign persons, are virtually identical to the provisions of § 2410c of title 50 appendix.[17] Section 5604(a)(1) of title 22,[18] which deals with the conduct of foreign *governments*, sets a specific, 60-day time limit for making presidential determinations after "persuasive information" becomes available to the executive branch that a foreign government is or has engaged in prescribed CBW uses.[19] Nothing nearly so stringent was written into § 2410c, inviting the inference that the President is less time-constrained in making determinations under that section. On the other hand, 22 U.S.C. § 5605(d) authorizes the waiver of most of the sanctions imposed under that section if the President certifies to Congress that such waiver "is essential to the national security interests of the United States." *Id.* § 5605(d)(1)(A)(i). No such waiver authority is given in the case of foreign person sanctions under title 50 appendix.[20] Thus, in the companion statutes to § 2410c, Congress limited the President's discretion over the timing of sanction-triggering determinations much more closely and explicitly, but also gave the President far broader power to waive sanctions. Overall, it appears to us, the President has broader discretion under the title 22 CBW provisions than under those in title 50 appendix. This outcome, we believe, reflects Congress's judgment that the President's constitutional foreign policy prerogatives are more deeply implicated, and so must be left less closely regulated, when *country* sanctions, rather than *foreign person* sanctions, are to be applied.

## C.

The textual and structural analysis of § 2410c and related statutes is inconclusive. On the one hand, there are strong arguments that the President is not *wholly* without discretion to delay making such determinations: the rule of statutory construction relating to delegations of foreign policy power, coupled with the absence of a detailed time-frame in § 2410c for making determinations, and the general rule that administering agencies are allowed reasonable delays in such matters, suggest that the President's discretion is by no means non-existent. On the other hand, there are also strong arguments for concluding that the statute leaves the President with little or no discretion to delay making § 2410c determinations.

---

[17] *See supra* notes 1, 3.

[18] This section originated as section 506 of the FRA, Pub. L. No. 102-138, 105 Stat. at 730, and was replaced by section 306 of the CBW, Pub. L. No. 102-182, 105 Stat. at 1252.

[19] The suggested dichotomy between foreign persons and foreign governments may operate imprecisely when the actions of foreign parastatal entities are at issue. Whether either or both sanctions' regimes should be invoked in response to the conduct of such entities will depend on the particular facts and circumstances of each case.

[20] Section 2410c does not, in terms, include any "waiver" authority until after sanctions have been applied for at least 12 months. *Implicit* waiver authority may be found in § 2410c(c)(2), entitled "Exceptions," which states that the President "shall not be required to apply or maintain" sanctions if certain conditions hold.

Given the uncertainty that remains after this examination of the statutory text and structure, we turn in the next Part to a consideration of the legislative and administrative history of § 2410c.

## IV.

Section 2410c codifies section 305 of the CBW, 105 Stat. at 1247. It is virtually identical to a statute adopted very shortly before by the same Congress, the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, Pub. L. No. 102–138, § 505(a), 105 Stat. at 724.[21] Section 309(a) of Pub. L. No. 102–182 repealed the earlier version. *See* CBW, 105 Stat. at 1258.

Both Congress and the Bush Administration had desired the adoption of CBW nonproliferation legislation even before 1991, but differed sharply over particular proposals. In 1990, Congress passed H.R. 4653, title IV of which (the Omnibus Export Amendments Act of 1990), was substantially the same as both current § 2410c and that section's immediate (but short-lived) precursor, title V of Pub. L. No. 102–138.[22] President Bush pocket-vetoed H.R. 4653.[23] In his memorandum of disapproval of November 16, 1990, President Bush declared his support for the "principal goals" of H.R. 4653, but objected to provisions that, in his judgment, "unduly interfere[d] with the President's constitutional responsibilities for carrying out foreign policy."[24] He identified as "[t]he major flaw" in H.R. 4653 "not the requirement of sanctions, but the rigid way in which they are imposed."[25] In lieu of signing H.R. 4653, President Bush issued an executive

---

[21] Although there were minor differences, Pub. L. No. 102–138 closely resembled the successor statute, Pub. L. No. 102–182. *See Statement on Signing Legislation on Trade and Unemployment Benefits*, 2 Pub. Papers of George Bush 1543, 1544 (Dec. 4, 1991) ("This Act is virtually identical to Title V of Public Law 102–138, which I signed into law on October 28, 1991. The only significant difference is the addition of import sanctions to the list of sanctions that are to be imposed and corresponding additions to the Presidential waiver provisions."); 137 Cong. Rec. 35,408 (1991) (remarks of Rep. McCurdy) ("[T]he conference report on H.R. 1724 contains virtually all of the provisions on chemical and biological weapons proliferations found in the conference report on H.R. 1415, the State Department authorization for fiscal years 1992 and 1993.").

[22] Section 423(a) of H.R. 4653, as enrolled and presented to the President, was virtually identical to § 2410c. Section 423(a) differed from what is now current law only in two minor respects. First, it did not provide that among the foreign countries, projects, or entities whose CBW efforts it was sanctionable to assist were those designated by the President, as under § 2410c(a)(2)(C). Second, it did not authorize an additional 90-day delay period for consultation with the foreign government of jurisdiction before sanctions had to be imposed, as in § 2410c(b)(2).

[23] *See* H.R. Conf. Rep. No. 102–238, at 154 (1990), *reprinted in* 1991 U.S.C.C.A.N. 439, 496.

[24] *Memorandum of Disapproval for the Omnibus Export Amendments Act of 1990*, 2 Pub. Papers of George Bush 1619 (Nov. 16, 1990).

[25] *Id.* The State Department had expressed objections to nondiscretionary sanctions early in the Bush Administration, during hearings in 1989 before the House Foreign Affairs Committee. *See Chemical Weapons Proliferation: Hearing and Markup of H.R. 3033 Before the House Comm. on Foreign Affairs and its Subcomms. on Arms Control, International Security and Science, and on International Economic Policy and Trade*, 101st Cong. 18 (1989) (colloquy between Chairman Dante Fascell and Assistant Secretary of State H. Allen Holmes). The State Department repeated its objections in a letter from Secretary of State James Baker to Senator Jesse Helms, relating to the Senate CBW bill, S. 195, 101st Cong. (1989). *See* Letter for Senator Jesse Helms from James D. Baker, Secretary of State (Oct. 16, 1990), *reprinted in* 136 Cong. Rec. 35,688 (1990).

In response, Senator Helms defended the Senate bill's provisions (which resemble later-enacted law) for nondiscretionary sanctions against foreign corporate CBW proliferators. He argued that "the Senate version is very tightly

Continued

order, Executive Order No. 12735,[26] that directed the imposition of the sanctions contained in H.R. 4653, and that implemented new chemical and biological weapon export controls.[27]

Early the following year, during the debate on S. 320, 102d Cong. (1991) the "Omnibus Export Administration Act of 1991," several Senators criticized President Bush's pocket-veto of H.R. 4653. Senator Riegle, for example, disagreed with President Bush's position in the pocket-veto message "that imposing nonwaivable sanctions on companies that knowingly and materially assist in the development of chemical or biological weapons for use by countries that use them in violation of international law is unjustifiable." 137 Cong. Rec. 3777 (1991). He stated that "[w]e simply must take a tough stand if we are to rid the world of the threat of such weapons." *Id.*[28]

Later in 1991, Congress adopted H.R. 1415 which, as noted, was in all relevant respects the same as both the earlier, pocket-vetoed bill, H.R. 4653, and current § 2410c. President Bush signed H.R. 1415 into law as Pub. L. No. 102–138 on October 28, 1991. President Bush issued a signing statement on that occasion.[29] As to the chemical and biological weapons provision in the legislation, the President stated:

> Title V, Chemical and Biological Weapons (CBW), raises concerns with respect to both the President's control over negotiations with foreign governments and the possible disclosure of sensitive information. Title V's provisions establish sanctions against foreign companies and countries involved in the spread or use of chemical and biological weapons. Title V demonstrates that the Congress endorses my goal of stemming dangerous CBW proliferation. *In*

---

drawn so that it applies sanctions only to violators who meet specific norms. I cannot imagine why my good friend, the Secretary, or the President, would ever want the flexibility to exempt a corporation that is guilty of proliferation of chemical and biological weapons and technology." 136 Cong. Rec. at 35,690. Senator Helms also explained, in a manner that sheds some light on the existing statute, the procedure for making presidential determinations: "[u]nder both the House and Senate bills, before sanctions can be imposed upon a foreign company, the President must first determine that the company had knowingly and either materially or substantially assisted the chemical or biological weapons program of Iraq or certain other outlaw nations. This is not an easy standard, and whether a company has met this standard is left to the discretion and judgment of the President." *Id.* at 35,689.

[26] *See* Exec. Order No. 12735, 3 C.F.R. 313 (1991) *reprinted in* 50 U.S C § 1701 note (1994).

[27] As President Bush characterized it, Exec. Order No. 12735 "sets forth a clear set of stringent sanctions, while encouraging negotiations with our friends and allies. It imposes an economic penalty on companies that contribute to the spread of these weapons and on countries that actually use such weapons or are making preparations to do so. At the same time, it allows the President necessary flexibility in implementing these sanctions and penalties." 2 Pub. Papers of George Bush at 1619–20 (Nov. 16, 1990).

[28] Senator Helms and Senator Heinz also criticized the pocket veto. *See* 137 Cong. Rec. at 3780 (1991) (remarks of Sen. Helms); *id.* at 3781 (remarks of Sen. Heinz). An Administration witness before the Senate Foreign Relations Committee in May, 1991, reiterated the Administration's constitutional and foreign policy objections to specific mandatory sanctions. *See Status of 1990 Bilateral Chemical Weapons Agreement and Multilateral Negotiation on Chemical Weapons Ban: Hearing Before the Senate Comm. on Foreign Relations,* 102d Cong. 19 (1991) (remarks of Ambassador Ronald F. Lehman, Director, U.S. Arms Control and Disarmament Agency). Nonetheless, the President did ultimately sign a bill that provided only limited waiver authority.

[29] *Statement on Signing the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993,* 2 Pub. Papers of George Bush 1344 (Oct. 28, 1991).

*signing this Act, it is my understanding, as reflected in the legislative history, that title V gives me the flexibility to protect intelligence sources and methods essential to the acquisition of intelligence about CBW proliferation. In part, such flexibility is available because title V does not dictate the timing of determinations that would lead to sanctions against foreign persons.*[30]

The legislative history to which President Bush referred appears to be a colloquy of October 8, 1991, between Representatives McCurdy and Berman.[31] Representative McCurdy was, at the time, Chair of the House Permanent Select Committee on Intelligence; Representative Berman was Chair of the Subcommittee on International Operations of the House Committee on Foreign Affairs. Because of its importance, the colloquy must be quoted at some length:

Mr. McCURDY . . . I would like to clarify the provisions in H.R. 1415 that amend the Export Administration Act and the Arms Export Control Act to provide for sanctions against foreign companies involved in the development or production of chemical and biological weapons. These provisions mandate sanctions once the President makes a determination that a foreign person has "knowingly and materially" contributed to the efforts by any foreign country to develop or use biological or chemical weapons.

I strongly endorse this effort to sanction foreign companies involved in the proliferation of chemical and biological weapons. I rise to clarify one point concerning the Presidential determinations called for in these provisions. It has come to my attention that, in rare circumstances, a premature determination might inhibit the flow of information which is necessary to the full imposition of sanctions against all violators. It seems to me that the President should be allowed to delay such a determination where it is necessary to protect intelligence sources and methods which are being

---

[30] *Id.* at 1345 (emphasis added).

[31] We note also that Congress had been advised in 1989, when considering earlier legislative proposals to sanction CBW proliferation, of the need to protect intelligence methods and sources. Testifying before the Senate Foreign Relations Committee, the Director of the Central Intelligence Agency, William Webster, answered a question from Senator Helms by saying, in part:

I think we have to find a way of using our intelligence, protecting our sources and our methods, so that we continue to collect intelligence, but to form a basis on which those laws [c]an be triggered, if they are passed.

I do not mean to be too obscure in what I am saying. You can develop sanctions, but the proof of the sanctions will depend upon some form of evidence, and some of the intelligence that we have is not readily convertible into evidence.

*Chemical and Biological Weapons Threat: The Urgent Need for Remedies: Hearings Before the Senate Comm. on Foreign Relations*, 101st Cong. 45 (1989).

used to acquire further, possibly more important, information on CBW proliferation.

Is it your understanding that the protection of intelligence sources or methods for the stated purpose may be a factor in deciding on the timing of a Presidential determination that a foreign person is contributing to CBW proliferation?

Mr. BERMAN . . . [I]t is my understanding that the President, in rare circumstances, could delay a determination that a foreign person has knowingly and materially contributed to CBW proliferation if such a delay is necessary to protect intelligence sources or methods essential to the acquisition of further intelligence about CBW proliferation. Such a delay would be appropriate, for example, where the United States is using the sensitive intelligence sources or methods to gather information on other CBW proliferators, or where additional time is needed to develop nonsensitive information that could be used to explain publicly the imposition of sanctions. However, such a delay should not be indefinite, because the ultimate purpose of these provisions is to sanction those foreign persons that we know to be knowingly and materially involved in CBW proliferation. Moreover, the delay should only be for the purpose of furthering our policy of sanctioning those proliferators. A delayed determination would not be justified to further any other policy.

137 Cong. Rec. 25,841 (1991).

Very shortly afterward, Congress enacted substantially the same chemical and biological weapons provision by passing H.R. 1724 (signed into law as Pub. L. No. 102–182 on December 4, 1991). On November 26, 1991, after the submission of the Conference Report on that legislation to the House of Representatives, Representative McCurdy inserted into the record the entirety of his October 8, 1991, colloquy with Representative Berman, to clarify that the President would have the same authority under H.R. 1724 to protect intelligence sources or methods that he had under Pub. L. No. 102–138. *See* 137 Cong. Rec. 35,408 (1991).

President Bush signed H.R. 1724 on December 4, 1991. In his signing statement, he pointed out that "[t]his Act is virtually identical to Title V of Public Law 102–138, which I signed into law on October 28, 1991," and affirmed that "[t]he observations regarding Title V of Public Law 102–138 that I made upon signing that bill into law are equally applicable to the Act I am signing today." [32]

---

[32] 2 Pub. Papers of George Bush at 1544 (Dec. 4, 1991).

We believe that this legislative and administrative history establishes that Congress intended to give the President discretion to delay, temporarily, the making of § 2410c determinations, when such a delay is necessary to protect intelligence sources or methods used to further CBW nonproliferation activities.

When the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 was enacted into law as part of the Foreign Relations Authorization Act, the President's signing statement pointedly construed the statute, in light of its legislative history, to give him "the flexibility to protect intelligence sources and methods essential to the acquisition of intelligence about CBW proliferation." [33] Only a few weeks after the President had published this administrative construction, Congress enacted a virtually identical statute as part of the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991, Pub. L. No. 102–182. On signing the latter Act, the President reiterated the construction he had placed upon its immediate precursor.[34] Although Congress had the opportunity to override or modify the President's construction, it chose instead to enact a virtually identical measure.

The President's October 28, 1991, construction of § 2410c is, under the particular circumstances of this case, authoritative. Congress was undoubtedly aware of this interpretation, which was prominently set forth in the President's signing statement of that date. Moreover, the October 8, 1991, colloquy between Representative McCurdy and Representative Berman, and the republication of that colloquy by Representative McCurdy on November 26, 1991, establish that Congress acted in the belief that the President would retain some measure of discretion to delay making the statutory determinations. In our judgment, Congress's decision to enact the CBW provision of Pub. L. No. 102–182 in November 1991, without in any way disturbing the interpretation set out by the President and by Representatives McCurdy and Berman in October 1991, constitutes a ratification of that interpretation.[35]

---

[33] 2 Pub. Papers of George Bush at 1345 (Oct. 28, 1991).

[34] 2 Pub. Papers of George Bush at 1543–44 (Dec. 4, 1991).

[35] *See, e.g., North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 535 (1982); *FEA v. Algonquin SNG, Inc.,* 426 U.S. 548, 567–68, 570–71 (1976).

Moreover, even apart from the earlier legislative and executive branch pronouncements, the President's December 9, 1991, signing statement would be entitled to some weight in construing § 2410c. "The President, after all, has a part in the legislative process, too, except as to bills passed over his veto, and his intent must be considered relevant to determining the meaning of a law in close cases." *United States v. Tharp,* 892 F.2d 691, 695 (8th Cir. 1989) (Arnold, J.). *See generally The Legal Significance of Presidential Signing Statements* 17 Op. O.L.C. 131 (1993). Reliance on a presidential signing statement may be particularly appropriate when (as here) the executive branch has played a significant role in developing the legislation. *See, e.g., United States v. Story,* 891 F.2d 988, 994 (2d Cir. 1989); *cf. Miller v. Youakim,* 440 U.S. 125, 144 (1979). As a general matter, of course, the contemporaneous construction of a statute by the administering officials — in this case, the President — is to be accorded substantial deference. *See, e.g., Power Reactor Dev. Co. v. International Union of Elec., Radio and Mach. Workers,* 367 U.S. 396, 408 (1961).

## V.

We are mindful of the fact that not all of the legislative history of §2410c supports our conclusion. We understand that the CIA made several attempts through informal communications with the House and Senate Foreign Affairs Committees to include a waiver provision or other mechanism for protecting intelligence sources and methods in the bill. These efforts ultimately were unsuccessful.

Though we give due weight to the fact that Congress was aware of the issue, the House Foreign Affairs Committee's failure or refusal to include in H.R. 1415 (or, for that matter, in the successor bill, H.R. 1724) the specific language that the CIA requested does not, in our view, undercut the claim that the President may temporarily delay making a determination to protect counterproliferation sources or methods. As the courts have said, any inferences based on congressional silence of this kind are highly problematic. "The advocacy of legislation by an administrative agency — and even the assertion of the need for it to accomplish a desired result — is an unsure and unreliable, and not a highly desirable, guide to statutory construction." *American Trucking Ass'ns v. Atchison, T. & S.F. Ry.*, 387 U.S. 397, 418 (1967); *see also Rastelli v. Warden, Metro. Correctional Ctr.*, 782 F.2d 17, 24 n.3 (2d Cir. 1986). Moreover, the evidence indicates that Congress did not reject the CIA's *concept*, even if it did not write the CIA's *language* into the bill.[36] The McCurdy-Berman colloquy reflects Congress's intent in passing H.R. 1415, and we are aware of nothing in the record that contradicts it. Beyond that, the enactment of H.R. 1724 *after* Representatives McCurdy and Berman had clarified the President's authority to protect counterproliferation sources or methods and *after* President Bush's October 28 signing statement had affirmed that he had such authority demonstrates clearly, in our view, that Congress accepted such an interpretation as correct.

## VI.

Although we have concluded that the President has some discretion to delay a determination under §2410c(a)(1), we emphasize that this discretion is not unlimited. In our judgment, the legislative history and administrative construction of the CBW Act, reviewed above, make clear that, except in extreme circumstances as discussed below, the President may delay making a §2410c determination only for the purpose of advancing the counterproliferation policy of the statute (and not, e.g., for other foreign policy or intelligence-related reasons). More specifically, again with the exception noted below, we think that any delay is permissible only if the delay is necessary to protect intelligence sources or methods used in counterproliferation activities. These limitations are reflected both

---

[36] We note that neither House of Congress voted on and rejected the proposed language.

o

in President Bush's signing statement and in the colloquy between Representatives McCurdy and Berman, which apparently informed President Bush's interpretation of the statute.[37]

## VII.

We have also been asked to consider whether the President can delay making a sanctions determination when no reasonable alternative means exist to protect the life of an intelligence source. We conclude that he can.

We believe that the President has the right, and indeed the duty, to protect the life of an intelligence source in such circumstances. This responsibility is rooted both in statutory law and in the President's constitutional authority to protect national security.[38] The President's obligations towards any intelligence source whose life would be at risk in this case if a determination were made are thus in direct conflict with the President's obligations under the CBW Act not to delay making a determination indefinitely, once the evidence establishes that a violation has taken place. Faced with such unavoidably conflicting obligations, we believe that the President may reasonably and lawfully conclude that the obligation to preserve the life of the source should prevail.

As a constitutional matter, the President, as Commander in Chief, has the inherent authority to employ sources for gathering intelligence needed to protect the national security of the United States.[39] The Executive's authority to gather intelligence information, and the related authority to protect the sources and methods used in gathering it,[40] were codified in the National Security Act of 1947, ch. 343, 61 Stat. 495 (codified as amended at 50 U.S.C. §§ 401–441d) ("NSA"). The NSA established the CIA and prescribed its responsibilities. In its current form, the statute declares that "the Director of Central Intelligence shall be responsible for providing national intelligence . . . to the President" and to other high-ranking civilian and military officers in the executive branch. 50 U.S.C. § 403–3(a)(1)(A), (B). Furthermore, the Director "shall . . . protect intelligence

---

[37] The colloquy is quoted in full *supra* pp. 16–17.

[38] In situations in which the lives of American citizens are in peril, indeed, the Supreme Court has suggested that the President has a constitutional duty to rescue them. *See Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 79 (1872). Under the so-called Hostages Act, 22 U.S.C. § 1732, the President also has a statutory duty in some circumstances to rescue American citizens held abroad. *See Worthy v. Herter*, 270 F.2d 905, 910 (D.C. Cir.) *cert. denied*, 361 U.S. 918 (1959).

[39] *See Totten v. United States*, 92 U.S. 105, 106 (1876) (The President "was undoubtedly authorized during the [Civil] war, as commander-in-chief of the armies of the United States, to employ secret agents to enter the rebel lines and obtain information respecting the strength, resources, and movements of the enemy."), *Warrantless Foreign Intelligence Surveillance—Use of Television—Beepers*, 2 Op. O.L.C. 14, 15 (1978) (The President has the "constitutional power to gather foreign intelligence.").

[40] *See New York Times Co. v. United States*, 403 U.S. 713, 729–30 (1971) (Stewart, J., joined by White, J., concurring) (It is the executive branch's "constitutional duty" to "protect the confidentiality necessary to carry out its responsibilities in the fields of international relations and national defense.").

sources and methods from unauthorized disclosure.'' *Id.* §403–3(c)(6). The Director is specifically charged to

> provide overall direction for the collection of national intelligence through human sources by elements of the intelligence community authorized to undertake such collection and, in coordination with other agencies of the Government which are authorized to undertake such collection, ensure that . . . *the risks to the United States and those involved in such collection are minimized.*

*Id.* § 403–3(d)(2) (emphasis added).[41]

In *CIA v. Sims*, 471 U.S. 159 (1985), a case decided before the National Security Act was amended to include the language quoted immediately above, the Supreme Court considered the nature and scope of the Agency's responsibilities to protect its intelligence sources. *Sims* was an action under the Freedom of Information Act (''FOIA'') to compel the Agency to disclose the names of individual researchers who had worked on an Agency-funded project. In declining to make such disclosure, the Agency relied on section 102(d)(3) of the NSA, a precursor of current 50 U.S.C. §403–3(c)(6). That section, formerly codified as 50 U.S.C. § 403(d)(3), provided that the Director ''shall be responsible for protecting intelligence sources and methods from unauthorized disclosure.'' NSA, § 102(d)(3), 61 Stat. at 498. The Court held that the Director was indeed authorized to withhold the identities of the researchers from disclosure under FOIA. *Sims*, 471 U.S. at 177.

In reaching that conclusion, the Court repeatedly emphasized the breadth of the Agency's power and responsibility to protect the identities of its sources. It stated that:

> Congress chartered the Agency with the responsibility of coordinating intelligence activities relating to national security. In order to carry out its mission, the Agency was expressly entrusted with protecting the heart of all intelligence operations—''sources and methods.''

*Id.* at 167 (footnote omitted).

> Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure.

---

[41] The duties and powers of the Director under the National Security Act are generally subject to the control of the President and exercised under the President's authority as Chief Executive. *See generally* Steven G. Calabresi and Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J 541, 595–96 (1994).

*Id.* at 168–69.

> Congress entrusted this Agency with sweeping power to protect its
> "intelligence sources and methods."

*Id.* at 169.

> Section 102(d)(3) specifically authorizes the Director of Central
> Intelligence to protect "intelligence sources and methods" from
> disclosure. Plainly the broad sweep of this statutory language com-
> ports with the nature of the Agency's unique responsibilities. . . .
> [T]he Director must have the authority to shield those Agency
> activities and sources from any disclosures that would unnecessarily
> compromise the Agency's efforts.

*Id.*

> The "statutory mandate" of § 102(d)(3) is clear: Congress gave the
> Director wide-ranging authority to "protec[t] intelligence sources
> and methods from unauthorized disclosure."

*Id.* at 177 (alteration in original).

The Court also found substantial support in the legislative and administrative
history of the Act for its view that the Director had "broad power to protect
the secrecy and integrity of the intelligence process," because "without such
protections the Agency would be virtually impotent." *Id.* at 170. It stated:

> Congress was . . . well aware of the importance of secrecy in
> the intelligence field. Both General Vandenberg and Allen Dulles
> testified about the grim consequences facing intelligence sources
> whose identities became known. Moreover, Dulles explained that
> even American citizens who freely supply intelligence information
> "close up like a clam" unless they can hold the Government
> "responsible to keep the complete security of the information they
> turn over. . . ."

> Against this background highlighting the requirements of effec-
> tive intelligence operations, Congress expressly made the Director
> of Central Intelligence responsible for "protecting intelligence
> sources and methods from unauthorized disclosure." This language
> stemmed from President Truman's Directive of January 22, 1946,
> 11 Fed. Reg. 1337, in which he established the National Intelligence
> Authority and the Central Intelligence Group, the Agency's prede-

323

cessors. . . . The fact that the mandate of § 102(d)(3) derives from this Presidential Directive reinforces our reading of the legislative history that Congress gave the Agency broad power to control the disclosure of intelligence sources.

*Id.* at 172–73 (citation omitted).

Finally, in rejecting the court of appeals' position that the Agency's authority to protect sources applied only to sources who provided information unobtainable without a guarantee of confidentiality, the Court underscored the "harsh realities" of intelligence-gathering and the "dangerous consequences" of a more permissive disclosure rule. *Id.* at 174.

> This forced disclosure of the identities of its intelligence sources could well have a devastating impact on the Agency's ability to carry out its mission. "The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." *Snepp v. United States*, 444 U.S. 507, 509, n.3 (1980) (per curiam). *See Haig v. Agee*, 453 U.S. 280, 307 (1981). If potentially valuable intelligence sources come to think that the Agency will be unable to maintain the confidentiality of its relationship to them, many could well refuse to supply information to the Agency in the first place.

*Id.* at 175.

As stated above, the National Security Act has been amended since *Sims* was decided. The Intelligence Organization Act of 1992, Pub. L. No. 102–496, §§ 701–706, 106 Stat. 3180, 3188, added a new section 103 to the National Security Act. *Id.* sec. 705(a), § 103, 106 Stat. at 3190. New section 103(c)(6) of the NSA, *see* 50 U.S.C. § 403–3(c)(6), states that the Director "shall . . . protect intelligence sources and methods from unauthorized disclosure." Former, section 102(d)(3), *see* 50 U.S.C. § 403, the provision construed in *Sims*, had stated in virtually identical terms that the Director "shall be responsible for protecting intelligence sources and methods from unauthorized disclosure." The language of the current statute, if anything, demonstrates even more clearly that the Director has an affirmative *obligation* to protect sources: it states that the Director "shall" protect such sources, not that he only "shall be responsible" for their protection.[42] Thus,

---

[42] Moreover, the legislative history of the 1992 provision reveals that Congress was aware of the *Sims* decision and, while not expressly ratifying it, also did not intend to disturb it. In explaining the current provision, the House Conference Report stated that

> the conferees wish to make clear that by including within the responsibilities of the Director of Central Intelligence the responsibility to protect intelligence sources and methods from unauthorized disclosure,

we believe that the duty to protect intelligence sources is at least as stringent under the current statute as it was under its predecessor.[43]

Moreover, the Intelligence Organization Act altered the National Security Act in another important and relevant respect. Under section 103(d)(2) of the National Security Act, as amended in 1992, *see* 50 U.S.C. § 403–3(d)(2), the Director is required to "ensure that . . . the risks to . . . those involved in such [intelligence] collection are minimized." This new language, which had no counterpart in the prior version of the National Security Act, heightens the Director's protective responsibilities towards the "human sources," *id.*, who are engaged in intelligence-gathering on the Agency's behalf.

Under the National Security Act, then, the President has an obligation to protect any intelligence source whose life would be endangered if the President determined that the foreign firm that employed the source had engaged in unlawful CBW proliferation. The President's statutory responsibilities under the two statutes are therefore in conflict in the particular circumstances of this case.

In general, if the President's legal obligations appear to conflict, we believe that his overriding duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 3, requires him to attempt to discover some reasonable means by which the conflict could be resolved and both duties discharged. In considering the possibly conflicting obligations imposed by the two statutes at issue here, due weight must be given to the fact that Congress was aware of the executive branch's concern that strict compliance with the terms of the CBW Act might compromise the protection of intelligence sources in some circumstances, yet failed to afford the President explicit authority to delay a determination or waive sanctions if necessary to protect intelligence sources and methods except to the extent necessary to continue to gather intelligence related to the proliferation activities sanctioned under the Act. That Congress afforded only a limited exception for the protection of intelligence sources and methods obligates the President to make determinations even when there is some risk that intelligence sources and methods will be compromised, and to take other reasonable measures to protect intelligence sources and methods from disclosure.

We are informed that in some circumstances, however, if the President can secure the life of the intelligence source at all, he can do so only by means that would expose the lives and safety of American personnel to substantial risk. We do not believe that the President's duty of rescue requires him to make such extraordinary efforts.[44] Short of taking such action, however, we understand that

the conferees take no position with respect to the interpretation of similar language in existing law in *CIA v. Sims*, 471 U.S. 159 (1985).

H.R. Conf. Rep. No. 102–963, at 88 (1992), *reprinted in* 1992 U.S.C.C.A.N. 2605, 2614.

[43] We note that the Supreme Court considered even the prior section to be a "mandate." *Sims*, 471 U.S. at 177.

[44] When a statute imposes a duty, it "authorizes by implication all reasonable and necessary means to effectuate the duty." *Supremacy Clause (Art. VI, cl. 2)—Central Intelligence Agency—Polygraph Examinations of Employee of CIA Contracts*, 2 Op. O.L.C. 426, 427 (1978). The President could properly conclude that the risks to the lives

Continued

the President can protect the life of the source by forbearing to make the determination, otherwise required by the CBW Act, that the source's employer is subject to sanctions. There is no evidence that Congress considered the possibility of this extreme dilemma when it passed the CBW Act. In these highly unusual circumstances, we believe that the President has the legal discretion to defer making the CBW Act determination, for so long as such a deferral is necessary to protect the life of the source.

## *Conclusion*

The President may delay making CBW Act determinations if a delay is necessary to protect intelligence sources or methods needed to acquire intelligence relating to CBW proliferation. He may also delay making such a determination when no other reasonable means exists for protecting the life of an intelligence source.[45]

Application of these legal standards to particular intelligence-gathering operations may prove to be difficult or complex, and will undoubtedly require careful assessments of the specific facts in each case. Please let us know if further advice from our Office on particular applications would be helpful.

> WALTER DELLINGER
> *Assistant Attorney General*
> *Office of Legal Counsel*

---

of the Government agents or military personnel who would be used in a rescue attempt would make such a course of action unreasonable. *See Durand v. Hollins*, 8 F. Cas. 111, 112 (C.C.S.D.N.Y 1860) (No. 4186) (Nelson, J., sitting as Circuit Justice) (Whether the President had a duty to protect American citizens whose lives and property were threatened in a foreign tumult "was a public political question . . . which belonged to the executive to determine.").

[45] We do not mean to exclude the possibility that the President may be legally able to delay making a determination in other circumstances that have not yet been presented to us for consideration.